## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **CHRIS RIEDEL**, an individual, 2605 South Winchester Boulevard Campbell, CA 95008 <br><br> Plaintiffs, <br><br> vs. <br><br> **BOSTON HEART DIAGNOSTICS CORPORATION,** a Delaware corporation; 175 Crossing Blvd. Suite 550 Framingham, MA 01701-4163 <br><br> Defendant. | Civil Case No. 1:12-cv-01423 |

## SECOND AMENDED COMPLAINT FOR MONEY DAMAGES AND CIVIL PENALTIES FOR VIOLATIONS OF THE FALSE CLAIMS ACT

## DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

II.  JURISDICTION AND VENUE ......................................................................... 5

III.  PARTIES .............................................................................................................. 6

IV.  FACTUAL ALLEGATIONS .............................................................................. 6

    A.  Boston Heart Pays Several Forms of Kickbacks to Induce the Referral of
        Medicare Business ................................................................................... 6

    B.  Federal Law prohibits the provision of anything of value to induce referrals .......... 7

    C.  Defendants' waivers of copayments and deductibles are illegal kickbacks .............. 9

    D.  Defendants Payment of Packaging Fees, Directly and Indirectly, are Illegal
        Kickbacks ............................................................................................... 15

    E.  Waiving Copayments and Deductibles, and Paying Packaging Fees Violates
        agreements between Boston Heart and Insurance Companies, as well as state
        law regarding insurance fraud .................................................................. 20

    F.  Self-Referrals from Physician Shareholders are illegal kickbacks ......................... 23

    G.  Boston Heart's Pre-selected Panels Lead to False Claims for Medically
        Unnecessary and Redundant Testing ...................................................... 24

    H.  Examples of Boston Heart's Clients Who Provided Self-Referrals, or
        Received Packaging Fees or Waivers of Co-Pays and Deductibles ....................... 27

    I.  Boston Heart, including its Board of Directors, Was Aware of the Illegality of
        the Conduct Described in this Suit ........................................................... 38

V.  CAUSES OF ACTION ...................................................................................... 41

    FIRST CAUSE OF ACTION
    On Behalf of the United States Federal False Claims Act,
    Presenting False Claims 31 U.S.C. § 3729(a)(1)(A) ....................................... 41

    SECOND CAUSE OF ACTION
    On Behalf of the United States Federal False Claims Act, Making or Using False
    Records or Statements Material to Payment or
    Approval of False Claims 31 U.S.C. § 3729(a)(1)(B) ..................................... 42

THIRD CAUSE OF ACTION
(In the Alternative) On Behalf of the United States Federal False Claims Act,
Retention of Proceeds to Which Not Entitled 31 U.S.C. § 3729(a)(1)(G) ...................... 43

VI.    PRAYER FOR RELIEF .............................................................................................. 43

VII.   DEMAND FOR JURY TRIAL ..................................................................................... 46

Plaintiffs UNITED STATES OF AMERICA ("United States"), by and through Relator

CHRIS RIEDEL ("Relator" or "*Qui Tam* Plaintiff"), alleges as follows:

## I. __INTRODUCTION__

1.      Since 2011, Defendant BOSTON HEART DIAGNOSTICS CORPORATION

("Boston Heart" or "Defendant") has perpetrated a multi-million dollar fraud on U.S. taxpayers

through a Medicare kickback scheme.  Defendant provides at least four forms of illegal

kickbacks to doctors and clinics in order to induce those doctors and clinics to refer Medicare

business to them, and bills Medicare for redundant and unnecessary testing.

2.      First, Defendant promised to doctors that it will waive co-payments or patient

deductible payments from the doctors' privately-insured patients.  In exchange for this benefit,

the doctors send all of their lipid-related business, including Medicare business, to Defendant.

As such, the waiver of deductibles and co-payments constitutes illegal remuneration, designed by

Defendant induce the referral of Medicare business to Defendant.

3.      Knowing co-pay waiver schemes were under scrutiny and illegal, Defendant

tweaked its fraud in 2016 to charge patients a "special fee" named a "Know It Now Price."  This

is the amount which will be charged to patients in lieu of a standard calculation of their co-pay or

deductible. For 75% of the tests on the fee schedule, the charge is $2.00 or less.  For 95% of the

tests, the charges is $7.00 or less.  This is a fraction of the co-payment requirement (usually in

excess of $100) based on Boston Heart's charges to insurance companies.  Boston Heart's sales

representatives tell physicians these are not co-payments and the prices are substantially below

Boston Heart's costs.

4.      Second, Defendant pays doctors kickbacks in the form of inflated "packaging"

fees for drawing blood specimens and packaging them for shipping to the lab.  The fees paid by

Defendant far exceed fair market value and constitute illegal remuneration designed to induce the referral of Medicare business to Defendant.

5.     A year after both a fraud alert issued by the Health and Human Services – Office of the Inspector General ("OIG"), and after the Department of Justice intervened in a false claims act lawsuit against three of its competitors, and with knowledge its payments were illegal, Boston Heart took steps to conceal the direct payments from Boston Heart to physicians in two ways.  First, Defendant began paying the fees to physicians' staff or family members.  Second, Defendant began making the payments through intermediary companies.  A Boston Heart sales representative, Heidi Ann Mooney, described the change to a physician:  "[the Department of] Justice said we can't pay you directly, so we pay [a third party], they take some of the money and they pay you.  *It is all about perception*."

6.     Third, some of the physicians that refer patients to Boston Heart are also shareholders of Boston Heart.  The shareholder physicians engage in strictly prohibited self-referrals without disclosing their financial stake in Boston Heart to their patients.  This is a violation of the Stark Law and of Federal prohibitions on self-referrals and anti-kickback laws.  Every bill to Medicare for tests performed on a self-referred patient is a False Claim.

7.     Fourth, Boston Heart paid outrageous consulting fees to referring physicians.  For example, in 2012 and 2013, the Company paid over $200,000 to Jeff Young NP, and Dharmesh Patel MD, who were among the top referral sources to the Company.  The physicians were paid under the group name Heart Attack and Stroke Prevention Alliance (HASPA, http//preventevents.com), located at 210 Liberty St., Jackson TN 38301.  The consulting fees were paid primarily for these physicians to solicit physician clients for Boston Heart by speaking at seminars where they **explained to physicians how much money they could make by**

2

**receiving packaging fees and splitting specimens between multiple labs, and how Boston Heart's large panels would have no impact on their patients.**  Detailed financial projections, based on the number of specimens submitted daily, and splitting specimens between 2 or 3 labs, were presented in handouts and slides.

8.     Each of these practices constitute an illegal kickback scheme, no more legal than if Defendant handed doctors envelopes of cash in exchange for Medicare referrals.  Defendant violated the False Claims Act by charging Medicare and other federally funded healthcare programs for lab tests that were referred to Defendant Boston Heart by providers because of kickbacks offered to those providers by Defendant.

9.     Defendant's practices are unlawful as a kickback scheme, strictly prohibited by Medicare statutes.  Specifically, 42 U.S.C. § 1320a-7b(b)(2)(A) prohibits "Illegal remunerations" for "Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) **directly or indirectly, overtly or covertly**, in cash or in kind to any person to induce such person  to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . ."  42 U.S.C. § 1320a-7b(b)(2)(A) (emphasis added).

10.     Interpretations of this language by the Federal authorities provide useful guidance in applying these anti-kickback laws, and establish that Defendants have violated the anti-kickback laws of the United States through the conduct described herein.  For example, the Federal Department of Health and Human Services, Office of the Inspector General ("OIG"), reaffirmed on May 9, 2008, that:  "[W]hen a laboratory offers or gives an item or service for free or less than fair market value to a referral source, an inference arises that the item or service is offered to induce the referral of business."  OIG Advisory Opinion No. 08-06.  An anti-kickback

3

"violation arises if the discount whatever its size is <u>implicitly or explicitly tied to referrals</u> of" government-funded business.  OIG Opinion Letter, April 26, 2000.

11.     Boston Heart also overbills Medicare by performing and charging for medically unnecessary tests. Boston Heart bills Medicare for the individual components of its lipid panel test, rather than using the lipid panel CPT code for billing.  Boston Heart added four additional tests to its pre-packaged lipid panel test beyond the industry standard, bloating a common panel with additional tests to inflate its bills to Medicare.  Because Boston Heart's lipid panel is not a standard lipid panel, and because Boston Heart bills for the individual components, it charges Medicare over $100 per panel test, rather than the $18.97 allowed for a lipid panel test.

12.     The bloated panel also includes redundant and duplicative testing.  Boston Heart's panel includes both an Apo B test, and an LDL-P test.  These tests measure the same thing:  total LDL particles.  There is no medical benefit to conducting both tests on a single patient because the tests provide the same medical information, and the course of treatment would not be affected by conducting both tests.

13.     The Boston Heart requisition was designed to induce physicians to order large panels of tests.  In 2008, the Complete One panel, the most commonly ordered panel, physicians could order 25 tests with the check of a single box.  See Exhibit 1, 2008 Boston Heart Requisition Form.  While Boston Heart has moved away from the Complete One panel, it still encourages physicians to order huge numbers of tests in various different panels.

14.     Medicare is administered by the United States government, and provides health coverage to people 65 years of age and older.  Medicare's costs are extraordinary.  In 2016, Medicare expenditures accounted for $588 billion of federal spending, which amounts to 15% of total federal spending.  Knowing that the federal Government lacks the ability to track the

4

massive amount of Medicare money as it flows through the complex healthcare delivery system, unscrupulous companies see government money as an easy source for padding their profits. Defendant has become part of its problem through their abuse of the Medicare program – a program designed to protect and benefit vulnerable citizens, not private companies.

15.     The anti-kickback statue arose out of Congressional concern that providing things of value to those who can influence healthcare decisions may corrupt their professional judgment and result in federal funds being diverted to pay for goods and services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. The AKS prohibits the payment of kickbacks in order to protect the integrity of Medicare, TRICARE, and other federal healthcare programs.

16.     In engaging in these illegal practices Defendant is not only cheating the system, but also driving competitors out of the marketplace, thereby reducing the quantity and quality of treatment options for elders.

17.     This is a *qui tam* action for violation of the Federal False Claims Act (31 U.S.C. §§ 3150 *et seq.*), to recover treble damages, civil penalties and attorneys' fees and costs for Plaintiffs, and on behalf of the United States for fraudulent Medicare billings.  Non-public information personally known to Relator serves as the basis of this action.

## II.     JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to 31 U.S.C. sections 3730(b) and 3732(a), which confer jurisdiction on this Court for actions brought under the Federal False Claims Act, and authorize nationwide service of process.  Venue is proper in this district pursuant to 31 U.S.C. section 3732(a), as Defendant transacts business in the District of Columbia.

III.   **PARTIES**

19.     The plaintiff in this action is the UNITED STATES OF AMERICA ("United States"), by and through Relator CHRIS RIEDEL.

20.     Relator CHRIS RIEDEL is an individual.  Prior to his retirement, Relator had a long career in the commercial reference laboratory business.  Relator no longer owns or runs his previous reference lab company, HunterHeart, or any other competitor of Boston Heart.

21.     Defendant BOSTON HEART DIAGNOSTICS CORPORATION is a Delaware corporation with its principal place of business in Massachusetts.

IV.   **FACTUAL ALLEGATIONS**

   A.     **Boston Heart Pays Several Forms of Kickbacks to Induce the Referral of Medicare Business**

22.     Boston Heart is a medical laboratory that specializes in advanced lipid testing. Advanced lipid testing helps identify coronary heart disease risk factors that standard cholesterol and other basic blood tests do not.  Advanced lipid tests tend to be more expensive than more basic medical laboratory tests, and consequently can result in higher profit margins for the laboratories that provide them.

23.     Because the purpose of advanced lipid testing is generally to detect, prevent, and manage coronary heart disease, the patient population that requires the testing is largely comprised of senior citizens covered by Medicare.  On information and belief, more than 30% of the tests conducted by Boston Heart are for patients covered by Medicare.  Lipid panels and related tests are among the most frequently ordered – and expensive – lab tests.

24.     Boston Heart is reimbursed by Medicare a total of over $600 for its popular Complete One lipid panel test, per patient.  This panel is often ordered four to six times per year.

Boston Heart's profit margins on its Medicare business are extraordinary.  Consequently, Defendant – desperate to capture and retain Medicare business – has pushed its marketing techniques into blatantly illegal territory.

25.     Specifically, in order to capture and retain Medicare business, Defendant has offered several forms of illegal remuneration to physician customers in order to "hook" the physician client and induce the referral of the physician's Medicare, Medicaid and insurance business.  Defendant violated the False Claims Act by charging Medicare for lab tests that were referred to Defendant by providers because of kickbacks offered to those providers by Defendant.

**B.     Federal Law prohibits the provision of anything of value to induce referrals**

26.     Defendant's practices are unlawful as kickback schemes, strictly prohibited by Medicare statutes.  Specifically, 42 U.S.C. § 1320a-7b(b)(2)(A) prohibits "Illegal remunerations" for "Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) ***directly or indirectly, overtly or covertly***, in cash or in kind to any person to induce such person  to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . ."  42 U.S.C. § 1320a-7b(b)(2)(A) (emphasis added).

27.     Interpretations of this language by the Federal authorities provide useful guidance in applying these anti-kickback laws, and establish that Defendant has violated the anti-kickback laws of the United States through the conduct described herein.

28.     For example, the Federal Department of Health and Human Services, Office of the Inspector General ("OIG"), reaffirmed on May 9, 2008, that:  "[W]hen a laboratory offers or gives an item or service for free **or less than fair market value to a referral source, an**

**inference arises that the item or service is offered to induce the referral of business**."  OIG

Advisory Opinion No. 08-06.  An anti-kickback "violation arises if the discount whatever its size

is **implicitly or explicitly tied** to referrals of" government-funded business.  OIG Opinion

Letter, April 26, 2000.

29.     OIG has also stated that "[w]henever a laboratory offers or gives to a source of

referrals anything of value not paid for at fair market value, the inference may be made that the

thing of value is offered to induce the referral of business." OIG Special Fraud Alert:

Arrangements for the Provision of Clinical Laboratory Services (Issued October 1994), available

at ttps://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html.

30.     Defendant violated the anti-kickback laws as described in OIG opinions by

waiving co-payments and deductibles and paying referring physicians and their staff inflated

"packaging" and draw fees, and both implicitly and explicitly tying these kickbacks to the

referral of Medicare business.  Defendant presented to Medicare claims for reimbursement of

laboratory tests the referral of which was induced, in whole or in part, directly or indirectly,

overtly or covertly, by the provision of the kickbacks described herein.  Each of those claims is a

violation of the False Claims Act.

31.     Each claim for payment submitted by Boston Heart, from at least 2010 to the

present, to Medicare that was referred to Defendant by a provider who received any of the three

forms of remuneration described above from Defendant constitutes a false claim in violation of

the False Claims Act (31 U.S.C. § 3729 *et seq.*).  Over this time period, Defendant has submitted

tens of thousands of such claims for payments, and collected millions of dollars from the

Government as a result of these illegal kickbacks.

**C.     Defendants' waivers of copayments and deductibles are illegal kickbacks**

32.     The first form of illegal remuneration is the waiver of private insurance co-payments and deductibles.  Waiving the patient's co-payment or deductible portion is illegal under the laws of several states, violates federal Medicare rules and anti-kickback statutes, and causes the submission of fraudulent claims to private insurance companies as well.

33.     In October 1994, the OIG issued a Special Fraud Alert, entitled "How Does the Anti-Kickback Statute Relate to Arrangement for the Provision of Clinical Lab Services?"  As an example of a situation giving rise to an inference of an illegal kickback, the Special Fraud Alert cited laboratories that waive charges to providers for lab tests of managed care patients (such as the co-payments of patients here).

34.     Some TRICARE options require participating members to pay a co-pay and/or to meet a deductible.  See 32 C.F.R. § 199.4(f). A provider of services cannot, as a matter of law, waive these co-pay or deductible requirements.  See 32 C.F.R. § 199.4(f)(9).  The same is true of many managed care plans.

35.     As part of their fiduciary responsibilities to those plans, the managed care companies are responsible for controlling healthcare costs.  One of the primary ways that managed care companies control costs is by requiring plan members to pay deductibles and copayments.  This provides a safeguard against plan members' health care providers ordering excessive testing or tests not medically useful on a patient by patient basis.

36.     One of the principal purposes behind copayment and deductible requirements is to make patients conscious of the expense of their medical services, and thereby discourage the ordering and performance of unnecessary medical services.  Copayments and deductibles act as

embedded internal controls for payors.  There is no better mechanism to ensure that unnecessary tests are not ordered than requiring patients to pay a portion of the invoices for laboratory tests.

37.    Waiving patients' insurance copayments and deductibles is of significant benefit to physicians and their patients:  physicians are not forced to explain expensive deductible and copayment requirements to angry patients and patients receive free laboratory testing. Physicians market free testing to their patients to make their offices more appealing, thereby improving the physicians' revenues.

38.    Waiving copayments and deductibles directly violates federal and state anti-kickback laws.  OIG has stated that "[w]henever a laboratory offers or gives to a source of referrals anything of value not paid for at fair market value, the inference may be made that the thing of value is offered to induce the referral of business."   See OIG Special Fraud Alert: Arrangements for the Provision of Clinical Laboratory Services (Issued October 1994), available at ttps://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html.

39.    Boston Heart defrauded Medicare and private insurers by routinely waiving patients' copayments and/or deductibles as an incentive for physicians to refer business to Boston Heart.

40.    A significant portion of a physician's non-Medicare patients will be covered by private insurance.  Typically, private insurance companies and some government healthcare programs require that a patient ordering a laboratory test make a co- payment of approximately 20% of allowable charges to the laboratory.  Private insurance companies also require their patients to make a deductible payment to the laboratory until the patient has met his/her deductible amount for the year. Although co-payments and deductibles can be a financial burden to patients, especially to those for whom physicians order Defendants' expensive panels and

tests, service providers are required to make all necessary efforts to collect co-payments from patients, with limited exceptions.

41.     For many patients, especially those being treated with statin therapy who require regular medical treatment and lipid testing with attendant co-payments at least four times per year, these co-payments and deductibles are substantial.

42.     Boston Heart's most common panel of tests is the Complete One panel, which costs $614.29.   The co-payment, if charged, would be approximately $122.   Boston Heart's copay waivers are of great benefit to the doctors, who are able to attract and retain the business of patients by promising no co-payments or patient deductible payments.   Accordingly, waiving the co-payment of patients is a significant benefit that a physician can provide to his or her patients.   Knowing this, Defendant promises physicians that it will waive the copayment, as long as the physicians send all of their lipid-related business – including Medicare business – to the Defendant's laboratory.   Boston Heart waives the remaining fee, writing off hundreds of dollars of charges for some patients.

43.     The deductible waivers are no different.   Again, in the case of the Complete One panel, the deductible payment, if charged, could be the entire $614.29, depending upon the patient's insurance plan and medical care.   Boston Heart sales representatives encourage physicians to order additional tests with the Complete One pane.   Attached as Exhibit 3 is an Explanation of Benefits ("EOB") for a panel of Boston Heart tests showing the total charges to be over $4,000.   Despite the EOB showing the services were not covered, the patient was never charged for the tests.

44.     Accordingly, the waiver of a deductible payment is a significant benefit that a physician can provide to his or her patients.   Knowing this, Defendant promises physicians that it

will waive deductibles, *so long as* the physicians send all of their lipid-related business – especially the highly profitable Medicare business – to the Defendant's laboratory.  Boston Heart waives the remaining fee, writing off hundreds or thousands of dollars of charges for some patients.

45.     Though Defendant loses money on uncollected co-payments and deductibles, it more than makes up the difference with the profits it earns on the Medicare referrals.  This Medicare business, induced by deductible and co-payment waivers for privately insured patients, is referred to in the industry as "pull-through" business.  The majority of Medicare patients are receiving statin therapy, and therefore receive lipid testing four (or more) times per year.  This amounts to annual Medicare payments of over $2,457 per patient, and significant profit to Boston Heart on each patient, making the write-offs required by the kickbacks to physicians more than worth the cost.

46.     By waiving patient deductible and co-payments, the physician is no longer subject to any restraint on whether tests are medically necessary because they are free for patients.  Indeed, by removing the patient's financial stake in the transaction, Defendants have neutralized one of the market's inherent checks on frivolous treatment – individual monetary responsibility for the cost of care.

47.     In 2014, the Department of Justice intervened in a false claims act complaint against Berkeley Heart Laboratories, alleging the failure to invoice patients for deductibles and co-payments to be illegal inducements under the Anti-Kickback laws – strong evidence the government considered the practice to be illegal.  The same year, the Department of Justice settled with two other Boston Heart competitors for $49 million based on their alleged failure to invoice patients for deductibles and co-payments.  Despite this, Boston Heart continued.

48.     Eventually, knowing the co-pay waivers violated the False Claims Act, in 2016 Boston Heart ceased the 100% waivers of co-pays and deductibles and replaced them with a new form of inducement for patient invoices.  As described to a southern California physician by Boston Heart sales person Mooney, "insurance companies in some states require that we must bill patients, so we came up with a fee schedule.  It is not a co-pay or a deductible, but rather a special fee."

49.     The "Know it Now" fee schedule now includes 60 tests.  See Exhibit 2, Know it Now fee schedule.  The fee schedule lists the "Know it Now Price" for these tests.  This is the amount which will be billed to the patient and collected by Boston Heart.  This is billed to patients as the total amount owed if they have not yet met their deductible for the year.  Where Boston Heart collects from an insurer for the services, and the only patient responsibility is for a co-payment, Boston Heart bills the "Know it Now Price" to the patients, rather than the 20% co-payment.

50.     For 57 of the 60 tests, the total price that will be charged to the patient in lieu of a deductible or co-pay is $7 or less.  For 45 of the 60 tests, the total price is either $1.00 or $2.00.  See Exhibit 2.   This conduct remains in violation of the law, and is only an artifice to allow Boston Heart to continue to offer inducements to physicians despite knowing that waiving co-pays or deductibles is illegal.  Boston Heart agrees with physicians up front that it will send "two invoices" to the patients, but states that they "do not send patients to collections."

51.     Not only are these prices effectively waivers of patients' co-payments and deductibles, they are substantially below Boston Heart's costs.  The below chart shows the total losses based on an estimate of Boston Heart's fully allocated costs.  In the laboratory industry, even high volume laboratories with massive volumes and economies of scale such as Quest

Diagnostics and Laboratory Corporation of America have difficulty reducing their fully allocated costs below 80% of the Medicare reimbursement rate.  As such, estimating Boston Heart's fully allocated costs conservatively, Boston Heart would lose in excess of $500 on orders of the Complete One panel off of its "Know It Now" fee schedule (see Exhibit 2).

| Test Description | CPT | Code Description | Medicare Fee | Estimated fully allocated cost | Know It Now Fee Schedule |
|---|---|---|---|---|---|
| Total Cholesterol | 82465 | Cholesterol, serum or whole blood, total | $6.16 | $4.93 | $1.00 |
| Direct LDL-C | 83721 | Lipoprotein, direct measurement; LDL cholesterol | $13.51 | $10.81 | $1.00 |
| Triglycerides | 84478 | Triglycerides | $8.15 | $6.52 | $1.00 |
| HDL-C | 83718 | Lipoprotein, direct measurement; high density cholesterol (HDL cholesterol) | $11.60 | $9.28 | $1.00 |
| SdLDL-C | 83883 | Nephelometry not elsewhere specified | $19.25 | $15.40 | $1.00 |
| Lipoprotein a | 83695 | Lipoprotein (a) | $18.34 | $14.67 | $1.00 |
| Apolipoprotein A-I | 82172 | Apolipoprotein, each | $19.97 | $15.98 | $1.00 |
| Apolipoprotein B | 82172-59 | Apolipoprotein, each | $19.97 | $15.98 | $1.00 |
| HDL Particle Subfractionating by 2 Dimensional Gel Electrophoresis | 83701 | Lipoprotein, blood; quantitation of lipoprotein particle numbers and lipoprotein particle subclasses | $35.16 | $28.13 | $10.00 |
| Pre-Beta 1 HDL (Precurser) | | | | | |
| Alpha 4 (Very Small) | | | | | |
| Alpha 3 (Small) | | | | | |
| Alpha 2 (Medium) | | | | | |
| Alpha 1 (Large HDL) | | | | | |
| Plasma Sterol Analysis | 82492 | Chromatography, quantitative, column (eg, gas, liquid or HPLC); multiple analytes, single stationary and mobile phase | $25.57 | $20.46 | $5.00 |
| Lathosterol | | | | | |
| Campesterol | | | | | |
| Beta-Sitosterol | | | | | |
| HsCRP | 86141 | High sensitivity C Reactive Protein | $18.34 | $14.67 | $1.00 |
| LpPLA2 | 83698 | Lipoprotein Associated Phospholipase A2 (LpPLA2) | $48.08 | $38.46 | $2.00 |
| NT-proBNP | 83880 | Natriuretic peptide | $48.08 | $38.46 | $1.00 |
| HbA1C | 83036 | Hemoglobin; glycosylated (A1C) | $13.75 | $11.00 | $1.00 |
| Insulin | 83525 | Insulin; total | $16.38 | $13.10 | $1.00 |
| ALT | 84460 | Transferase; alanine amino (ALT) | $7.50 | $6.00 | $1.00 |
| AST | 84450 | Transferase; aspartate amino (AST) | $2.89 | $2.31 | $1.00 |
| CK | 82550 | Creatine Kinase | $9.23 | $7.38 | $1.00 |
| Creatinine | 82565 | Creatinine, blood | $5.32 | $4.26 | $1.00 |
| BUN | 84520 | Assay of Urea Nitrogen | $4.36 | $3.49 | $1.00 |
| Uric Acid | 84550 | Uric Acid | $6.40 | $5.12 | $1.00 |
| TSH | 84443 | Thyroid Stimulating Hormone | $23.80 | $19.04 | $1.00 |
| Alkaline Phosphatase | 84075 | Phosphatase, alkaline | $3.08 | $2.46 | $1.00 |
| ApoE | 83891, 83896 x8, 83898 x2, 83908 x2, 83912 | | $153.44 | $122.75 | $4.00 |
| Factor V  Leiden (1) | 83891 83892-2 83896-5 83903, 83912 | | $75.76 | $60.61 | $4.00 |
| Prothrombin (Factor II) G20210A Genotype (1) | 83891 83892-2 83896-5 83903, 83912 | | $75.76 | $60.61 | $3.00 |
| | | **Total** | **$689.85** | **$551.88** | **$48.00** |

52.    The fact Boston Heart agrees to accept less than 10% of the amount it costs to perform the tests when it bills patients is a clear inducement to obtain the referral of profitable Medicare and insurance paid business.  There is no rationale for agreeing to lose money other than to use the waivers as loss leaders and inducements for additional business.

14

**D.      Defendants Payment of Packaging Fees, Directly and Indirectly, are Illegal Kickbacks**

53.      The second form of illegal remuneration provided by Defendant to induce the referral of Medicare business is the payment to physicians of inflated "packaging" fees.

54.      In June 2005, the OIG issued an Advisory Opinion concluding that payments by a laboratory to referring physicians of $6 per day for "collection of blood samples," likely constituted "prohibited remuneration under the anti-kickback statute."  OIG Advisory Opinion No. 05-08, at pp. 1-2.  Specifically, the OIG concluded that:

> **Where a laboratory pays a referring physician to perform blood draws, particularly where the amount paid is more than the laboratory receives in Medicare reimbursement, an inference arises that the compensation is paid as an inducement to the physician to refer patients to the laboratory** . . . .
>
> . . . . Because the physicians would receive a portion of the Lab's reimbursement for blood tests resulting from the physicians' referrals, **the physicians have a strong incentive to order more blood tests.  As a result, there is a risk of overutilization and inappropriate higher costs to the Federal health care programs.**

*Id.* at p. 4.

55.      The "packaging" fees paid by Defendant to referring providers in this case are no different.  As in the "collection" fees paid in the Advisory Opinion's scenario, the "packaging" fee and other "compensation provides an obvious financial benefit to the referring physician, and it may be inferred that this benefit would be in exchange for referrals to the Lab."  OIG Advisory Opinion No. 05-08, at p. 4.  Currently, Medicare pays a $3.00 "draw fee," for collecting physicians.  The "packaging" fees paid by Defendant are many multiples of this Medicare draw fee, and physicians are encouraged to use multiple laboratories in order to inflate the "packaging" fees.  This alone gives rise to an inference of illegal remuneration.  Moreover, as in

15

the scenario considered by the OIG's Advisory Opinion, the "packaging" fees, waiving patient co-payments and deductibles, and other remuneration provided by Defendant has the effect of incentivizing physicians to order more tests, creating a "risk of overutilization and inappropriate higher costs to the Federal health care programs." *See id.* at p. 4.

56.     When a physician orders a test for a patient, the physician can either send the patient to the laboratory to have blood drawn, or the physician can have a nurse or medical assistant in the physician's office draw the blood, after which the specimen is packaged and sent to the laboratory in a shipping package provided and paid for by the laboratory.

57.     Boston Heart does not have a wide network of blood draw centers, and most blood specimens are drawn by the physicians who order the tests.  When a physician's office draws the specimen, standard industry practice allows for the laboratory to pay the physician a nominal fee for the small amount of time it takes to draw and package the specimen.  Medicare provides a $3 payment to physicians for drawing a specimen.  Payments substantially in excess of this amount are considered to be inducements.

58.     Boston Heart pays referring physicians draw and "packaging" fees that are well over the $3 Medicare amount, far exceeding standard industry practice and fair market value.

59.     Boston Heart encourages physicians to break up their testing needs among multiple colluding laboratories in order to receive draw fees from multiple sources rather than have one lab perform all the tests.  Boston Heart has colluded with other laboratories, including Health Diagnostic Laboratories, Singulex, Liposcience and Atherotech.  This facilitates multiple "packaging" fees per patient, rather than just one fee per patient, regardless of the number of labs to which the test specimens are sent.  After the OIG Fraud Alert regarding paying packaging fees and waiving patient deductible and co-payments, two of Boston Heart's competitors, Health

Diagnostic Laboratories and Atherotech, stopped the practice.  Both companies entered

bankruptcy in less than a year.

60.     The difference in the amount of time and effort that it takes to draw and package

multiple specimens from the same patient, as opposed to a single specimen, is negligible;

multiple specimens are drawn from the same venipuncture, and are centrifuged and packaged at

the same time.  Accordingly, a physician can draw two vials of blood, order tests from Boston

Heart and another laboratory, ship them in two packages to Defendant and the other laboratory,

and receive an already inflated "packaging" fee from Defendant — an amount that far exceeds

reasonable compensation — and another "packaging" fee from another laboratory.

61.     Boston Heart actively encourages physicians to order additional tests – whether

medically necessary or not – in order to increase the number of "packaging" fees physicians

receive.  Defendant promotes this practice by sponsoring seminars that discuss how profitable

splitting up tests between laboratories can be for physicians.  Ms. Mooney encouraged a

physician in Newport Beach in April 2016 to send specimens to multiple labs for the purpose of

increasing the number of "packaging" fees and the total revenue for the doctor.  These multiple

"packaging" fees are pure artifice, thinly disguised kickbacks.

62.     In late 2014 and 2015, Defendant slightly modified this fee payment program, and

instead of paying doctors directly, began paying doctors' staff and family members for drawing

blood specimens and packaging them for shipping.  Defendant pays doctors' staff as much as

$25 per blood draw.  This arrangement allows medical staff to supplement their own income.

Defendant encourages physicians to share the kickback to their medical staff.  The kickbacks

also allow physicians to pay their staff less, knowing the supplemental income from Boston

Heart will make up the difference.  This remuneration is illegal as it induces physicians to order tests from Defendant.

63.     After an OIG ruling in 2014 that the payment of packaging and handling fees to physicians had been illegal since 1995, rather that stop the practice of incentivizing physician referrals through cash payments, Boston Heart simply changed its scheme to further conceal it by using third parties to make the payments to physician staff and families, rather than Boston Heart paying physicians directly.

64.     Boston Heart entered into contracts with various third parties, including, but not limited to LLmobileLab, Biotex and VeniExpress, to pay the $15 packaging and handling fees. Boston Heart pays the third party, who retains a portion of the payment and pays the other portion (typically around a 50/50 split) to someone in the physician's office, even if that person did not perform the phlebotomy or is not a trained phlebotomist.

65.     Ms. Mooney told a physician in April 2016 that the scheme was evolving. According to Ms. Mooney, Biotex has a "Process and Handling List fee schedule" and works with Boston Heart to facilitate payments for specimens sent to Boston Heart and other laboratories.

66.     In April 2016, Ms. Mooney told a California physician:  "Justice [the Department of Justice] said we can't pay you [the physician] directly, so we pay [a third party], they take some of the money and they pay you.  *It is all about perception*."  The Boston Heart representative arranged to have payments made to the physician's spouse, who has a different last name, for packaging fees for patients sent to Boston Heart.  These payments were made through a third party, including Biotex, LLmobileLab, and VeniExpress.  Biotex's representative

explained that they would pay a $15 packaging fee for tests sent to Boston Heart, and that "it didn't even matter if [the payee] was a relative as long as the last names were different."

67.    Boston Heart's representative explained this creates financial benefits for the physician and that it was a good way to keep staff.  The arrangement provides another source of income for the office and means it is possible to pay below market rates or forego bonuses due to the supplementary income the Packaging Fees provide.

68.    The Boston Heart representative also confirmed the physician could participate in "stacking" by ordering labs from multiple companies to generate multiple payments. Again, a third party would arrange for those payments among multiple colluding laboratories.  For example, Biotex pays (or paid) $15 for specimens sent to Boston Heart as well as several other laboratories.  Boston Heart encourages physicians to send a single patients specimens to multiple different laboratories for different tests, allowing for multiple packaging fees and multiple charges to Medicare or insurance for the same patient.

69.    On or about October 31, 2016, Boston Heart sent a letter to some (if not all) of the persons with whom it had entered into agreements to pay the Packaging and Handling fees.  In the letter, Boston Heart explained it was providing formal written notice of termination of the agreement, and requested that all invoices for services provided before October 31, 2016 be sent within 30 days.  Boston Heart ceased paying packaging fees directly to physicians or their practices at that time.

70.    According to a former Boston Heart employee, within months of Boston Heart beginning to invoice patients for deductibles and co-payments, even through use of its below cost, "Know it Now" fees, Boston Heart lost 40% of its revenue.

71.     Three other reference laboratories engaged in similar waivers of copays and deductibles also saw huge drops in revenues when forced to end their practices by pressure from DOJ:  Health Diagnostics Laboratories, Liposcience and Atherotech lost huge portions of their business (as much as 70% in some states).  Within a year, Health Diagnostics and Atherotech went into bankruptcy, and Liposcience was sold.

**E.      Waiving Copayments and Deductibles, and Paying Packaging Fees Violates agreements between Boston Heart and Insurance Companies, as well as state law regarding insurance fraud**

72.     Most states have enacted insurance fraud provisions as part of the relevant state's insurance code. Typically, insurance fraud includes the presenting of false or misleading information to a private insurance carrier in conjunction with the submittal of a claim for payment.

73.     For example, the Delaware Code includes the following provision:

> It shall be a fraudulent insurance act for a person to knowingly, by act or omission, with intent to injure, defraud or deceive: Prepare, present or cause to be presented to any insurer, any oral or written statement including computer-generated documents as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, containing false, incomplete or misleading information concerning any fact material to such claims.

18 Del. C. § 2407(a)(2).

74.     A provider that routinely waives patient copays can be charged with insurance fraud under these laws because the provider is falsely reporting its charges to the insurance carrier if the provider routinely waives applicable copayments or deductibles by misrepresenting the amount a provider intends to collect from both the carrier and the patient.  When a provider waives the patient's obligation, the charge reported to the health insurance carrier is inflated.

20

75.     California's Department of Public Health issued a notice regarding non-compliance inducements in June 2015[1] stating that it was an inducement to pay fees to employees of physicians when they collect specimens from patients.  Similarly, California law bans waivers of co-payments and deductibles.  See Reynolds v. California Dental Service, 200 Cal. App. 3d 590, 602 (1988) ("The ban against waiving the copayment is simply the corollary of the rule that a [health care provider] must report his true fee to [the plan]; if a [health care provider] intends to waive the copayment, it is fraudulent for him to report to the [the plan] that his fee includes the copayment.").

76.     The state of Florida enacted legislation that criminalizes the practice of routinely billing an amount as a customary charge, if the provider intends to waive the patient copayment. The Florida Statute states:

> It shall constitute a material omission and insurance fraud, punishable as provided in subsection (11), for any service provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, if such provider has agreed with the insured or intends to waive deductibles or copayments, or does not for any other reason intend to collect the total amount of such charge.

Fla. Stat. § 817.234(7)(a).

77.     One way managed care companies control costs is by entering into networks of healthcare providers whereby the providers agree to accept fixed rates for services in exchange for access to plan members.  The managed care companies' arrangements with providers benefit the plans and their members by controlling overall health care costs and increasing the quality of medical care.  Members who receive services from participating, or "in-network," providers

---

[1] See https://www.cdph.ca.gov/Programs/OSPHLD/LFS/CDPH%20Document%20Library/CLTAC-Non-ComplianceInducementLetter.pdf.

benefit from the providers agreeing not to bill the patient for any difference between their plan's reimbursement to the provider and the provider's billed charge.

78.     Plan members are free to use out-of-network providers, but the members must pay a portion of the cost of treatment provided by those out-of-network providers, through co-payments, co-insurances and/or deductible payments.  Generally, out-of-network providers charge much higher rates than in-network providers, which incentivizes members to choose in-network providers and moderate their demand for out-of-network services.  Likewise, the patient's burden in paying a portion of the costs ensures that providers are not charging rates untethered to the actual costs or market for providing medical services, and helps to ensure the services are medically necessary and appropriate.

79.     In October 2014 Cigna sued Health Diagnostic Labs, in U.S. District Court in Connecticut, accuses HDL of "a fraudulent fee-forgiving scheme" that involved not charging Cigna insurance plan members for their share of the cost of out-of-network blood-testing services provided by HDL.   See Case No. 3:14-cv-01519-SRU, ECF No. 1, p. 3, ¶ 9.  The Complaint went on to state: "HDL has developed a business model designed to game the health care system by submitting grossly inflated, phantom 'charges' to Cigna that do not reflect the actual amount HDL bills patients."   *Id*. at p. 10, ¶ 44.  Cigna settled with Health Diagnostic Laboratories for $59 million.  See Case No. 3:15-bk-32919-KRH, E.D.V.A., ECF No. 1263 at pp. 4-5.

80.     Aetna filed a similar complaint in the eastern District of Pennsylvania (Case No. 2:15-cv-01868), which settled in April 2016 with Health Diagnostic Laboratories agreeing to pay $77.4 million.  See In re: Health Diagnostic Laboratory Inc., et al, Case No. 3:15-bk-32919-KRH, E.D.V.A., ECF No. 1071, pp. 5-6.

81.     For the 2017 EOB attached as Exhibit 3, the insurer declined all charges, which amounted to over $4,000, but the patient never received an invoice for any amount.

82.     Defendants undermine this safeguard by fraudulently waiving patient deductibles and co-payments.

### F.     Self-Referrals from Physician Shareholders are illegal kickbacks

83.     Defendant also uses its physician shareholders to refer patients to receive laboratory tests at Boston Heart.  This is self-referral, a particularly inappropriate form of kickback, and a violation of the Stark Law.  Like the other kickbacks, self-referral monetarily rewards physician shareholders for each and every order they place with Defendant, undermining their ability to provide objective, effective, and efficient care.  The illegal benefits Defendant provides to physicians creates lucrative incentives for physicians to order unnecessary tests and to provide Boston Heart with all of the physicians' laboratory business.  These are inducements for referral of businesses to be paid by taxpayer dollars.

84.     Defendant also violated the anti-kickback laws by using physicians with a financial stake in Boston Heart to refer their laboratory business to Boston Heart.  Boston Heart relied on physicians that were also shareholders in Boston Heart to provide additional laboratory referrals.  This self-referral is directly in violation of 42 USC section 1395nn, subsection (a)(1), which proscribes a physician from referring a patient to an entity "if [the] physician (or an immediate family member of such physician) has a financial relationship with [the] entity."

85.     On September 23, 2010 the Center for Medicare & Medicaid Services ("CMS") published the "CMS Voluntary Self-Referral Disclosure Protocol" pursuant to the Affordable Care Act.  There, CMS stated that "conduct that raises liability risks under the physician self-referral statute may also raise liability risks under … the federal anti-kickback statute."  CMS

Voluntary Self-Referral Disclosure Protocol at p. 2.  Each laboratory test Boston Heart billed to

Medicare and performed on a patient referred by a physician with a financial stake in Boston

Heart constitutes a violation of the Federal False Claims Act.

      **G.**      **Boston Heart's Pre-selected Panels Lead to False Claims for Medically**

               **Unnecessary and Redundant Testing**

86.     In addition to providing illegal kickbacks, Defendant overcharges Medicare by

unbundling its tests and bloating its panels.  As of October 5, 2015, Medicare guidelines state

that cardiovascular risk assessment panels performed on patients with pre-existing risk factors

for cardio vascular diseases are not medically reasonable or necessary and, therefore, not covered

by Medicare.  Specifically, the new Palmetto GBA Medicare policy states the following:

> CV risk assessment panels, consisting of various combinations of biochemical, immunologic, hematologic, and molecular tests, is considered screening when performed on an asymptomatic patient, and, as such, are not a Medicare benefit. These CV risk assessment panels are not medically reasonable and necessary if performed on a patient with existing risk factors including but not limited to pre-diabetes or diabetes, smoking, hypertension or hyperlipidemia because these panels are not specific to a patient's lipid abnormality or disease.

Palmetto Medicare Policy Guidelines, page 2 of 21, attached as Exhibit 4.

87.     Despite these clear Medicare guidelines, Boston Heart continues to encourage

doctors to order their pre-selected panel tests.

88.     Boston Heart violated the False Claims Act by submitting claims for payment for

laboratory panel tests that individually billed for each component of a panel series of tests.

Medicare reimburses laboratories for tests on either an individual or panel basis.

89.     Patients with a history of heart disease or who present with symptoms that

indicate heart disease often receive a lipid panel, which includes a series of blood tests that

measure triglycerides, lipoproteins, cholesterol, and other relevant markers.

90.     Medicare pays a lower rate for the lipid panel than the sum of each individual component, reflecting the economies of scale inherent in running multiple, simultaneous tests. Boston Heart, however, manipulates this process by packaging additional tests with its lipid panel and refusing to use the correct CPT code for the lipid panel of tests.

91.     The industry standard lipid panel contains four components, and Medicare has designated a CPT code for the lipid panel.  Boston Heart has "redefined" this common panel by adding four additional tests – sdLDL-C, Lp(a), Apo A-1 and Apo B.  Thus, physicians ordering the common lipid panel also order these four additional components, and cannot order the panel without receiving these additional tests.  See Requisition Form, Exhibit 1.

92.     Boston Heart then bills Medicare the individual components of its lipid panel test, rather than using the lipid panel CPT code 80061 for billing.  The Medicare reimbursement for the lipid panel using CPT code 80061 is $18.71.  The Medicare reimbursement for the same components of the lipid panel, CPT code 80061, totals $39.42 when billed separately.  Boston Heart then tacks on four (4) additional tests totaling $77.53.  Accordingly, instead of ordering the standard lipid panel, which contains four test components, Boston Heart orders eight individual tests.  This technique allows Boston Heart to charge Medicare over $100 per lipid panel, rather than the $18.97 allowed by Medicare.   Each time it does so, Boston Heart violates the False Claims Act.

93.     This process is known as "unbundling" or "code stacking," and falsely represents that each of the individually billed testing components was actually performed individually, rather than as part of a panel of tests.  Each claim for a test that was run as part of a lipid panel but billed as an individual test using the code stacking method constitutes a violation of the Federal False Claims Acts.

94.     Defendant is not protected by the fact that CMS allows parties to bill component parts of panels individually so long as they accept the lower panel reimbursement amount because Boston Heart's bloated lipid panel has no unique CPT code or lowered reimbursement amount.  Thus, but adding redundant tests, Boston Heart is able to bill for substantially more than it would receive if it properly tested and billed.

95.     Boston Heart's bloated panel includes both an Apo B test, and an LDL-P test.  A world-class cardiologist, Paul Ziajka, MD, PHD, has indicated there is no medical benefit in offering both LDL-P and total LDL particles.  Dr. Ziajka has authored five textbooks on lipid management, been an investigator in more than 50 clinical trials involving heart disease, has been published numerous times in peer-reviewed medical journals, is a past President of the Southeastern Lipid Society, sits on the editorial board of the Journal of Clinical Lipidology, and helped create the standards used for board certification by the Board of Clinical Lipidology.

96.     At all times relevant hereto, Defendant knew that Federal law prohibited code stacking and the manipulation of Medicare reimbursement.  Defendant certified, both explicitly and implicitly, that each claim it submitted to Medicare would fully comply with all statutes and regulations, and that as Medicare providers, it would comply with all pertinent statutes and regulations.

97.     Each claim for payment submitted by Boston Heart, from at least 2009 to the present, to Medicare that employed code stacking constitutes a false claim in violation of the False Claims Act (31 U.S.C. § 3729 et seq.).  Over this time period, Defendant has submitted thousands of such claims for payments, and millions of dollars from the Government as a result of these false claims.

**H.     Examples of Boston Heart's Clients Who Provided Self-Referrals, or Received Packaging Fees or Waivers of Co-Pays and Deductibles**

98.     The following physicians were paid Packaging and Handling fees by Boston Heart, and received agreements from Boston Heart that their patients would not be charged private insurance co-pays or deductibles.  These physicians were paid both directly by Boston Heart and by third party as well as having payments made to third parties on their behalf.

a.     Dr. Gaston Perez, Global Family Medicine, with offices at 14 Oak Forest Rd # D, Bluffton, SC 29910, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Dr. Perez has participated in Boston Heart's third party payer scheme with, on information and belief, payments going to Dr. Perez's mother.  In addition, Dr. Perez's patients did not receive invoices until 2016.

b.     The Stern Cardiovascular Center, with offices at 7362 Southcrest Pkwy, Southaven, MS 38671, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Stern Cardiovascular has participated in Boston Heart's third party payer scheme.  In addition, Stern Cardiovascular patients did not receive invoices until 2016.

c.     The Heart Attach and Stroke Prevention Alliance (HASPA), through Jeff Young NP, and Dharmesh Patel, with offices 210 Liberty St., Jackson TN 38301, was two of Boston Heart's largest referral sources.  Nurse practitioner Young and Dr. Patel received Packaging and Handling fees from Boston Heart for years.  Along with consulting fees, they received more than $200,000 in 2012 and 2013 from Boston Heart.  Since 2015, they have participated in Boston Heart's third party payer scheme.  In addition, their patients did not receive invoices until 2016

27

     d.      Samuel Mayeda, MD, with offices at 1140 W La Veta Ave # 420, Orange, CA 92868, has received Packaging and Handling fees from Boston Heart for years.  On January 26, 2015, Dr. Mayeda and several other southern California physicians were discussing the Boston Heart shift in payment to third parties as discussed in paragraph 9 of this Complaint.  Dr. Mayeda reported his payments to law enforcement authorities in the state of California as well as to the FBI.  Dr. Mayeda presented authorities with all of his Boston Heart payment records, including documents showing he was still receiving direct payments after the May 2014 OIG Fraud Alert relating to payment of packaging fees.

     e.      Dr. Pankaj Desai, with offices at 90 Painters Mill Rd, Owings Mills, MD 21117, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Dr. Desai has participated in Boston Heart's third party payer scheme.  In addition, Dr. Desai's patients did not receive invoices until 2016.

     f.      Dr. Robert Skinner, with offices at 3451 Goodman Rd E, Suite 115, Southaven, MS 38672, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Dr. Skinner has participated in Boston Heart's third party payer scheme.  In addition, Dr. Skinner's patients did not receive invoices until 2016.

     g.      Internal Medical Associates, with offices at 551 Azalea Drive, Oxford, MS 38655, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Internal Medical Associates has participated in Boston Heart's third party payer scheme.  In addition, Internal Medical Associates patients did not receive invoices until 2016.

h.      Dr. Albert Lopez, with offices at 4291 Roosevelt Blvd., Jacksonville, FL 32210, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Dr. Lopez has participated in Boston Heart's third party payer scheme.  In addition, Dr. Lopez's patients did not receive invoices until 2016.

i.      Dr. Mary Gaffney, with offices at 4935 Albemarle Rd., Charlotte, NC 28205, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Dr. Gaffney has participated in Boston Heart's third party payer scheme. In addition, Dr. Gaffney's patients did not receive invoices until 2016.

j.       Ballantyne Medical Associates, with offices at 12311 Copper Way, Suite 100, Charlotte, NC 28277, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Ballantyne Medical Associates has participated in Boston Heart's third party payer scheme.  In addition, Ballantyne Medical Associates patients did not receive invoices until 2016.

k.      Susan Montgomery, a Nurse Practitioner, with offices at 122 Weisenberger Road, Madison, MS 39110, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Ms. Montgomery has participated in Boston Heart's third party payer scheme.  In addition, Dr. Montgomery's patients did not receive invoices until 2016.

l.      Carnahan Clinic, with offices at 7900 Airways Blvd, Building A, Suite 6, Southaven, MS 38671, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Carnahan Clinic has participated in Boston Heart's third party payer scheme.  In addition, Carnahan Clinic patients did not receive invoices until 2016.

29

m.      Dr. Hutchinson, Madison Heart Clinic, with offices at 794 Highway 51, Suite D, Madison MS  39110, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Dr. Hutchinson has participated in Boston Heart's third party payer scheme.  In addition, Dr. Hutchinson's patients did not receive invoices until 2016.

n.      Cleveland Medical, with offices at 810 E Sunflower Rd, Cleveland, MS 38732, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Cleveland Medical Clinic has participated in Boston Heart's third party payer scheme.  In addition, Cleveland Medical patients did not receive invoices until 2016.

o.      Rush Clinic, with offices at 5503 N Stateline Ave, Texarkana, TX 75503, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Rush Clinic has participated in Boston Heart's third party payer scheme.  In addition, Rush Clinic patients did not receive invoices until 2016.

p.      Dr. R Patel, Sun Medical, with offices at 633 East Ray Road, Building 1, Suite 101, Gilbert, AZ  85296, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Dr. Patel has participated in Boston Heart's third party payer scheme.  In addition, Dr. Patel's patients did not receive invoices until 2016.

q.      Megan McCarthy, a Nurse Practitioner, with offices at 2149 E Baseline Rd, Tempe, AZ 85283, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Ms. McCarthy has participated in Boston Heart's third party payer scheme.  In addition, Ms. McCarthy's patients did not receive invoices until 2016.

r.      Advanced Heart Care, with offices at 8150 N. Central Expy, Suite M1001, Dallas, TX 75206, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Advanced Heart Care has participated in Boston Heart's third party

payer scheme.  In addition, Advanced Heart Care patients did not receive invoices until 2016.

s.      Madden Medical Clinic, with offices at 1071 East Franklin Street, Carthage, MS 39051, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Madden Medical Clinic has participated in Boston Heart's third party payer scheme.  In addition, Madden Medical Clinic patients did not receive invoices until 2016.

t.      Heart Care of Tulsa, with offices at 802 S Jackson Ave, Tulsa, OK 74127, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Heart Clinic of Tulsa has participated in Boston Heart's third party payer scheme.  In addition, Heart Care of Tulsa patients did not receive invoices until 2016.

u.      Dr. L. Carter, with offices at 420 N Center St., Hickory, NC 286015, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Dr. Carter has participated in Boston Heart's third party payer scheme.  In addition, Dr. Carter's patients did not receive invoices until 2016.

v.      Dr. David Wright, with offices at 8066 Walnut Run, Cordova, TN 38018, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Dr. Wright has participated in Boston Heart's third party payer scheme.  In addition, Dr. Wright's patients did not receive invoices until 2016.

w.      Dr. J. Oliver Hardy, with an office in Whitehaven, MS, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Dr. Hardy has participated in Boston Heart's third party payer scheme.  In addition, Dr. Hardy's patients did not receive invoices until 2016.

x.      Dr. Craig Walker, with offices at 2730 Ambassador Caffery Pkwy., Lafayette, LA 70506, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Dr. Walker has participated in Boston Heart's third party payer scheme.  In addition, Dr. Walker's patients did not receive invoices until 2016.

y.      Dr. Randall Huling, with offices at 9075 E Sandidge Rd., Olive Branch, MS 38654, has received Packaging and Handling fees from Boston Heart for years. Since 2015 Dr. Huling has participated in Boston Heart's third party payer scheme.  In addition, Dr. Huling's patients did not receive invoices until 2016.

z.      Matrix Wellness Solutions, with offices at 384 Carriage House Dr., Suite D, Jackson, TN 38305, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Matrix Wellness Solutions has participated in Boston Heart's third party payer scheme.  In addition, Matrix Wellness patients did not receive invoices until 2016.

aa.      Cardiovascular Physicians of Memphis, with offices 6644 Summer Knoll Cove, Memphis, TN 38134, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Cardiovascular Physicians of Memphis has participated in Boston Heart's third party payer scheme.  In addition, Cardiovascular Physicians of Memphis patients did not receive invoices until 2016.

bb.      Dr. Stephen Sigal and Dr. Bernard Gojer, Signal Heart Center, with offices at 820 S. Baxter Avenue, Tyler, TX 38305, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Dr. Sigal and Dr. Gojer have participated in Boston Heart's third party payer scheme.  In addition, Dr. Sigal and Gojer's patients did not receive invoices until 2016.

cc.     Family Health Clinic of Grenada, with offices at 1117 Sunset Drive, Suite 104, Granada, MS 38901, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Family Health Clinic of Grenada has participated in Boston Heart's third party payer scheme.  In addition, Family Health Clinic of Granada patients did not receive invoices until 2016.

dd.     Dr. Martial R. Knieser, Preventive Care Medical, with offices at 7430 Shadeland Avenue, Suite 150, Indianapolis, IN 46250, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Dr. Knieser has participated in Boston Heart's third party payer scheme.  In addition, Dr. Knieser's patients did not receive invoices until 2016.

ee.     Dr. Kevin Greene, Feel Well Health Center of Southington, with offices at 710 Main Street, Building 4, Plantsville, CT 06479, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Dr. Greene has participated in Boston Heart's third party payer scheme.  In addition, Dr. Greene's patients did not receive invoices until 2016.

ff.     Deirdre Detraz, a Nurse Practitioner at Apex Prevention, with offices at 2801 Kaliste Saloom Road, Suite 200B, Lafayette, LA 70508, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Ms. Detraz has participated in Boston Heart's third party payer scheme.  In addition, Ms. Detraz's patients did not receive invoices until 2016.

gg.     Gina Pritchard, a Nurse Practitioner at The PREVENT! Clinic, with offices at 127 Gilmer St, Sulphur Springs, TX 75482, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Ms. Pritchard has participated in

33

Boston Heart's third party payer scheme.  In addition, Ms. Pritchard's patients did not receive invoices until 2016.

hh.     Dr. Anthony J. Leone, with offices at 807 N. Haddon Ave. #206, Haddonfield, NJ 08033, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Dr. Leone has participated in Boston Heart's third party payer scheme. In addition, Dr. Leone's patients did not receive invoices until 2016.

ii.      JMJ Family Physicians, with offices at 807 N. Haddon Ave. #206, Haddonfield, NJ 08033, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Dr. Leone has participated in Boston Heart's third party payer scheme. In addition, Dr. Leone's patients did not receive invoices until 2016.

jj.      Dr. Mel Voulgaropoulos, Carolina Family Medicine & Urgent Care, with offices at 1503 E. Broad St., Statesville, NC, 28477, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Dr. Voulgaropoulos has participated in Boston Heart's third party payer scheme.  In addition, Dr. Pat Voulgaropoulos's patients did not receive invoices until 2016.

kk.     Family Physicians of Memphis, with several offices in Memphis, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Family Physicians of Memphis has participated in Boston Heart's third party payer scheme.  In addition, Family Physicians of Memphis patients did not receive invoices until 2016.

ll.      Dr. Soteria Karahalios, Prima Heart, with offices at 1010 Cass Street, Suite A-1, Monterey, CA 93940, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Dr. Karahalios has participated in Boston Heart's third party payer scheme.  In addition, Dr. Karahalios patients did not receive invoices until 2016.

mm.     Larry Rose, PA, with offices at 2 Upper Ragsdale Drive, Monterey, CA 93940, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Mr. Rose has participated in Boston Heart's third party payer scheme.  In addition, Mr. Rose patients did not receive invoices until 2016.

nn.     Dr. Scott Schneiderman, with offices at 835 Cass St, Monterey, CA 93940, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Dr. Schneiderman has participated in Boston Heart's third party payer scheme.  In addition, Dr. Schneiderman patients did not receive invoices until 2016.

oo.     Revolutions Naturopathic, with offices at 230 Blue Ravine Rd, Folsom, CA 95630, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Revolutions Naturopathic has participated in Boston Heart's third party payer scheme.  In addition, Revolutions Naturopathic patients did not receive invoices until 2016.

pp.     Dr. Eric Hassid, with offices at 1010 Nut Tree Rd Suite 200, Vacaville, CA 95687, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Dr. Hassid has participated in Boston Heart's third party payer scheme.  In addition, Dr. Hassid patients did not receive invoices until 2016.

qq.     Dr. Elliott Light, Siang Lo, DO and Erin Golic, PA, with offices at 621 Forest Avenue, Pacific Grove, CA 93950, Dr. Elliott Light, Ms. Siang Lo, and Ms. Golic have received Packaging and Handling fees from Boston Heart for years.  Since 2015 Dr. Elliott Light, Ms. Lo, and Ms. Golic have participated in Boston Heart's third party payer scheme.  In addition, Dr. Elliott Light, Ms. Lo, and Ms. Golic patients did not receive invoices until 2016.

35

rr.     Dr. John Nelson, with offices at 7061 N Whitney Ave, Fresno, CA 93720, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Dr. Nelson has participated in Boston Heart's third party payer scheme.  In addition, Dr. Nelson patients did not receive invoices until 2016.

ss.     Dry Creek Medical Group, with offices at 2151 Herndon Ave Suite 105, Clovis, CA 93611, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Dry Creek Medical Group has participated in Boston Heart's third party payer scheme.  In addition, Dry Creek Medical Group's patients did not receive invoices until 2016.

tt.     Dr. Peter Sliskovich, with offices at 1360 W 6th St # 120, San Pedro, CA 90732, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Dr. Sliskovich has participated in Boston Heart's third party payer scheme.  In addition, Dr. Sliskovich's patients did not receive invoices until 2016.

uu.     Dr. Jeff Emery, with offices at 2214 E 29th Ave, Spokane, WA 99223, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 Dr. Emery has participated in Boston Heart's third party payer scheme.  In addition, Dr. Emery's patients did not receive invoices until 2016.

vv.     North Cascade Cardiology, with offices at 2979 Squalicum Pkwy #101, Bellingham, WA 98225, has received Packaging and Handling fees from Boston Heart for years.  Since 2015 North Cascade Cardiology has participated in Boston Heart's third party payer scheme.  In addition, North Cascade Cardiology's patients did not receive invoices until 2016.

ww.    Dr. Sanjeev Saxena, Amiee Kilgo, NP, and M Renee Banks, NP,

Appalachian Cardiology, with offices at 2979 Squalicum Pkwy #101, Bellingham, WA

98225, has received Packaging and Handling fees from Boston Heart for years.  Since

2015 North Cascade Cardiology has participated in Boston Heart's third party payer

scheme.  In addition, North Cascade Cardiology's patients did not receive invoices until

2016.

xx.    Gordon C Gunn, MD, with offices at 100 E Valencia Mesa Dr #215,

Fullerton, CA 928353, has received Packaging and Handling fees from Boston Heart for

years.  Since 2015 Dr. Gunn has participated in Boston Heart's third party payer scheme.

In addition, Dr. Gunn's patients did not receive invoices until 2016.

99.    The following are examples of physicians, practices or hospitals self-referred

business to Boston Heart.

a.    Dr. Ken Johnson, HeartPlace Baylor Heart & Vascular Hospital, 621 N.

Hall St., Suite 500, Dallas, TX 75226 was a shareholder of Boston Heart until the

Company was acquired by Eurofins in 2015.  In violation of the Stark Law, Dr. Johnson

did not disclose his ownership to patients.  Dr. Johnson has received Packaging and

Handling fees from Boston Heart.  Since 2015, Dr. Johnson has participated in Boston

Heart's third party payer scheme. In addition, Dr. Johnson's patients did not receive

invoices until 2016.

b.    Dr. Earl L. Yunes, with offices at 272 Chestnut St, Needham, MA 02492,

was a shareholder of Boston Heart until the Company was acquired by Eurofins in 2015.

In clear violation of the Stark Law, Dr. Yunes did not disclose his ownership to patients.

Dr. Yunes has received Packaging and Handling fees from Boston Heart for years.  Since

2015 Dr. Yunes has participated in Boston Heart's third party payer scheme. In addition, Dr. Yunes patients did not receive invoices until 2016.

## I.    Boston Heart, including its Board of Directors, Was Aware of the Illegality of the Conduct Described in this Suit

100.    At all times relevant hereto, Defendant knew that Federal law prohibited its giving or receiving these kickbacks and self-referrals.  Defendant certified, both explicitly and implicitly, that each claim it submitted to Medicare would fully comply with all statutes and regulations, including the anti-kickback provisions and the self-referral provisions, and that as Medicare providers, it would comply with all pertinent statutes and regulations, including the anti-kickback provisions and self-referral provisions.

101.    Relator Chris Riedel served on Boston Heart's board of directors from 2007 until majority control of the Company was acquired by Bain Capital Venture Fund in late 2010.  Mr. Riedel resigned from the board around the fourth quarter of 2010.  Prior to his resignation, Mr. Riedel had advised Boston Heart against engaging in the practices described in the complaint on several occasions.

102.    During the time Mr. Riedel was on the board at Boston Heart, competitors' policies of paying packaging and handling (or draw or phlebotomy) fees to physicians and never billing patients was discussed at several board meetings.  During those meetings, Mr. Riedel and others voiced concerns about the propriety and legality of the conduct, and it was ultimately decided that Boston Heart would not employ them.

103.    In 2010, Bain took effective control of Boston Heart.  Alice Limkaking, a Bain manager who negotiated the investment, went on the board of directors, along with a CEO recruited by Bain, Susan Hertzberg.  Another Bain Partner, Jeff Crisan, was also placed on the

board of directors.  Soon thereafter, Boston Heart instituted the payment of packaging fees to physicians and of never billing patients for copays or deductibles.  Ms. Hertzberg, Mr. Crisan and Ms. Limkaking were involved in the decision to institute the payment of packaging fees to physicians.

104.    Even though Mr. Riedel was no longer on the board of directs, he remained a shareholder.  When he learned about Boston Heart's practices, he wrote to the board of directors demanding an investigation and the cessation of the illegal activities.  On September 15, 2011, Mr. Riedel sent a letter to the board of directors notifying it that Boston Heart was engaged in "wrongful conduct that is highly injurious to the corporation and its stockholders."  The letter demanded the board "investigate such conduct through independent counsel, take all action necessary to stop such conduct, voluntarily report to appropriate authorities and third parties all violations, and take all actions necessary to discipline and seek compensation from those responsible."

105.    Mr. Riedel's letter explained to the board that (1) physician shareholders were not disclosing their ownership in BH, a clear Stark violation; (2) draw fees were being paid to physicians that were far beyond the reasonable norms and Boston Heart was colluding with individuals to encourage physicians to split testing between cardiovascular companies for the purpose of increasing physician profits; and (3) Boston Heart was not charging patients deductibles or co-payments.  Mr. Riedel informed the board the conduct was illegal.

106.    Two weeks later, after Mr. Riedel had heard nothing from Boston Heart, he sent a second letter, through counsel, demanding the board of directors take action and investigate and remediate the issues he had raised.  On November 15, 2011, Mr. Riedel's attorney wrote again demanding "all illegal or improper activity" immediately cease.  The third letter closed with:

"Unless Mr. Riedel receives all of the information requested in his September 15, 2011 letter by Friday, November 18, 2011, he will simply turn over his information to the U.S. Attorney." Eight months later the board had still not complied with Mr. Riedel's demand for a full investigation and report to shareholders.  Consequently, Mr. Riedel filed this lawsuit in August 2012.

107.    Included among the individuals who knew the conduct was illegal, yet moved forward with the plan, are the following:

a.  Susan Hertzberg, the President and Chief Executive Officer of Boston Heart, from July 2010 to the present.  She is also a shareholder.

b.  Peter Parker, the Chairman of Boston Heart's Board of Directors, and a Shareholder. Parker owned 150,000 common shares, and 50,000 Preferred A shares.  Parker profited over $1.4 million when he sold the shares in 2014.  The profit was the direct result of the fraudulent schemes described in this complaint.

c.  Alice Limkaking, Director, Shareholder, and Chief Business Officer of Boston Heart.

d.  Frank Yunes, Secretary and General Counsel of Boston Heart, and a Shareholder.  Yunes had 50,000 common shares.  Yunes profited over $300,000 when he sold the shares 2014.  The profit was the direct result of the fraudulent schemes described in this complaint.

e.  Jeff Crison, Director of Boston Heart.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**On Behalf of the United States**
**Federal False Claims Act, Presenting False Claims**
**31 U.S.C. § 3729(a)(1)(A)**

108.    Plaintiffs incorporate by reference and reallege all of the allegations contained in paragraphs 1 through 39 of this Complaint as though fully set forth herein.

109.    Defendant knowingly (as defined in 31 U.S.C. § 3729(b)(1)) presented or caused to be presented false claims for payment or approval to an officer or employee of the United States.

110.    Defendant knowingly presented false records and statements, including but not limited to bills, invoices, requests for reimbursement, and records of services, in order to obtain payment or approval of charges by the Medicare program that were higher than it was permitted to claim or charge by applicable law.  Among other things, Defendant knowingly submitted false claims for Medicare business that was obtained by means of, and as a result of, illegal kickbacks.

111.    Defendant knowingly made, used, and caused to be made and used false certifications that its claims, and all documents and data upon which those claims were based, were accurate, and were supplied in full compliance with all applicable statutes and regulations.

112.    The conduct of Defendant violated 31 U.S.C. § 3729(a)(1)(A) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.


*/ / /*

## SECOND CAUSE OF ACTION
**On Behalf of the United States Federal False Claims Act, Making or Using False Records
or Statements Material to Payment or Approval of False Claims
31 U.S.C. § 3729(a)(1)(B)**

113.    Plaintiffs incorporate by reference and reallege all of the allegations contained in

paragraphs 1 through 39 of this Complaint as though fully set forth herein.

114.    Defendant knowingly (as defined in 31 U.S.C. § 3729(b)(1)) made, used, or

caused to be made or used false records or statements material to false or fraudulent claims.

115.    Defendant knowingly made, used, and/or caused to be made and used false

records and statements, including but not limited to bills, invoices, requests for reimbursement,

and records of services, that were material to the payment or approval of charges by the

Medicare program that were higher than it was permitted to claim or charge by applicable law.

Among other things, Defendant made and used bills for Medicare business that was obtained by

means of, and as a result of, illegal kickbacks.

116.    Defendant knowingly made, used, and caused to be made and used false

certifications that its claims, and all documents and data upon which those claims were based,

were accurate, and were supplied in full compliance with all applicable statutes and regulations.

117.    The conduct of Defendant violated 31 U.S.C. § 3729(a)(1)(B) and was a

substantial factor in causing the United States to sustain damages in an amount according to

proof.

/ / /

## THIRD CAUSE OF ACTION
### (In the Alternative)
### On Behalf of the United States Federal False Claims Act, Retention of
### Proceeds to Which Not Entitled
### 31 U.S.C. § 3729(a)(1)(G)

118.    Plaintiffs incorporate by reference and reallege all of the allegations contained in paragraphs 1 through 39 of this Complaint as though fully set forth herein.

119.    In the alternative, Defendant knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

120.    As discussed above, Defendant received far more money from the Medicare programs than it was entitled to.  Defendant knew that it received more money than it was entitled to, and avoided its obligation to return the excess money to the Government.

121.    The conduct of Defendant violated 31 U.S.C. § 3729(a)(1)(G) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

## VI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs by and through Relator, pray judgment in its favor and against Defendant as follows:

1.    That judgment be entered in favor of plaintiff UNITED STATES OF AMERICA ex rel. CHRIS RIEDEL, and against Defendant BOSTON HEART, according to proof, as follows:

a.      On the First Cause of Action (Presenting False Claims (31 U.S.C. § 3729(a)(1)(A))) damages as provided by 31 U.S.C. § 3729(a)(1), in the amount of:

     i.     Triple the amount of damages sustained by the Government;

     ii.     Civil penalties of Ten Thousand Dollars ($10,000.00) for each false claim;

     iii.     Recovery of costs;

     iv.     Pre- and post-judgment interest;

     v.     Such other and further relief as the Court deems just and proper;

b.      On the Second Cause of Action (False Claims Act; Making or Using False Records or Statements Material to Payment or Approval of False Claims (31 U.S.C. § 3729(a)(1)(B))) damages as provided by 31 U.S.C. § 3729(a)(1) in the amount of:

     i.     Triple the amount of damages sustained by the Government;

     ii.     Civil penalties of Ten Thousand Dollars ($10,000.00) for each false claim;

     iii.     Recovery of costs;

     iv.     Pre- and post-judgment interest;

     v.     Such other and further relief as the Court deems just and proper;

d.      On the Third Cause of Action (False Claims Act, Retention of Proceeds to Which Not Entitled (31 U.S.C. § 3729(a)(1)(G))) damages as provided by 31 U.S.C. § 3729(a)(1) in the amount of:

     i.     Triple the amount of damages sustained by the Government;

    ii.      Civil penalties of Ten Thousand Dollars ($10,000.00) for each

            false claim;

    iii.     Recovery of costs;

    iv.     Pre- and post-judgment interest;

    v.      Such other and further relief as the Court deems just and proper.

2.      Further, Relator, on his own behalf, pursuant to 31 U.S.C. section 3730(d), requests that he receive such maximum amount as permitted by law, of the proceeds of this action or settlement of this action collected by the United States, plus an amount for reasonable expenses incurred, plus reasonable attorneys' fees and costs of this action.  Relator requests that his percentage be based upon the total value recovered, including any amounts received from individuals or entities not parties to this action.

Respectfully Submitted,

Dated:  October 4, 2017        **COTCHETT, PITRE & McCARTHY, LLP**

By: _____*/s/ Eric J. Buescher*_____
           ERIC J. BUESCHER (DC Bar No. 1008476)
           NIALL P. McCARTHY (admitted *pro hac vice*)
           JUSTIN T. BERGER (admitted *pro hac vice*)

/ / /

## VII.    DEMAND FOR JURY TRIAL

Relator CHRIS RIEDEL hereby demands a jury trial on all issues so triable.

Respectfully Submitted,

Dated:  October 4, 2017                **COTCHETT, PITRE & McCARTHY, LLP**


By: _____*/s/ Eric J. Buescher*_____
            ERIC J. BUESCHER (DC Bar No. 1008476)
            NIALL P. McCARTHY (admitted *pro hac vice*)
            JUSTIN T. BERGER (admitted *pro hac vice*)

**Exhibit 1**



**Boston Heart Lab**

2 Central Street
Framingham, MA 01701

Phone 508-877-8711
Fax 508-877-8707
Web www.bostonheartlab.com

Ernst J. Schaefer, M.D.
Laboratory Director
CLIA No. 22D1083041

## REQUESTING PHYSICIAN

| Clinician Name | | |
|---|---|---|
| Address | | |
| City | State | Zip |
| Phone | | FAX |
| Physician's or Authorized Signature | | Date |

## PATIENT INFORMATION

| Last Name (Please Print) | First | Middle Initial |
|---|---|---|
| Address | | |
| City | State | Zip |

| Sex M ☐ F ☐ | Date of Birth | Home Phone |
|---|---|---|
| SSN | | Work Phone |

Height: ☐☐ Feet ☐☐ Inches   Weight: ☐☐☐ lb.

## PATIENT HISTORY/ MEDICATION INFORMATION

For optimal diagnosis please check all that applies to patient:

- ☐ (treated) hypertension
- ☐ history of stroke/CHD
- ☐ smoking
- ☐ diabetes
- ☐ on niacin
- ☐ on ezetimibe
- ☐ on a statin, please list: _____
- ☐ on a fibrate
- ☐ none of the above

## BILLING AND INSURANCE INFORMATION

**Reminder**

Note: Only medically necessary and reasonable tests should be ordered when Medicare reimbursement will be required.

- Have patient sign Release of Benefits below.
- Copy BOTH sides of the patient's insurance card(s).
- Indicate primary and secondary diagnoses.
- If patient is NOT the guarantor/executor of the policy, the following guarantor information is REQUIRED:

Name: _____
DOB: _____
SSN: _____

### Release and Assignment of Benefits

I authorize Boston Heart Corporation to release to Medicare, its intermediaries (including Blue Cross/Blue Shield) any insurance carrier providing medical benefits to me and any health plan of which I am a member, and any medical or other information needed for claim or payment purposes. I understand that I am responsible for any charges that may be denied or partially reimbursed by my insurance carrier. I agree that a photocopy or pdf copy of this form shall be valid as the original. I further agree that this authorization will cover all medical services performed until such authorization is revoked by me.

Patient's Signature _____   Date _____

## PHLEBOTOMY INFORMATION

| Collection Date | Drawing Lab |
|---|---|
| Time | Phone |
| Name | Number of fasting hours | Insulin ☐ | if yes, time of last dose: |

## TESTS

| Please mark to order [X] | R-R Panel | R-R Panel Custom | R-R Panel Follow up | Complete One | Complete w/o genotyping | Lipid Panel | Individual Tests |
|---|---|---|---|---|---|---|---|
| Total Cholesterol | X | X | ☐ | X | X | X | ☐ |
| Direct LDL-C | X | X | ☐ | X | X | X | ☐ |
| Triglycerides | X | X | ☐ | X | X | X | ☐ |
| HDL-C | X | X | ☐ | X | X | X | ☐ |
| SdLDL-C | X | X | ☐ | X | X | | ☐ |
| Lp(a) | X | ☐ | ☐ | X | X | | ☐ |
| ApoA-I | X | ☐ | ☐ | X | X | | ☐ |
| ApoB | X | ☐ | ☐ | X | X | | ☐ |
| Pre-Beta1 HDL (Precursor) | R-R | R-R | R-R | X | X | | |
| Alpha4 (Very Small) | R-R | R-R | R-R | X | X | | HDL-Map |
| Alpha3 (Small) | R-R | R-R | R-R | X | X | | |
| Alpha2 (Medium) | R-R | R-R | R-R | X | X | | (includes TG, HDL-C, ApoA-I) |
| Alpha1 (Large HDL) | R-R | R-R | R-R | X | X | | |
| Lathosterol | R-R | R-R | R-R | | | | CholBT |
| Campesterol | R-R | R-R | R-R | | | | |
| Beta-Sitosterol | R-R | R-R | R-R | | | | (includes TC) |
| HsCRP | X | | | X | X | | ☐ |
| LpPLA2 | X | | | X | X | | ☐ |
| NT-proBNP | X | | | X | X | | ☐ |
| HbA1c | X | X | ☐ | X | X | | ☐ |
| Insulin | X | | | X | X | | ☐ |
| ALT | X | | | X | X | | ☐ |
| AST | X | | | X | X | | ☐ |
| CK | X | | | X | X | | ☐ |
| Creatinine | X | | | X | X | | ☐ |
| BUN | X | | | X | X | | ☐ |
| Uric acid | X | | | X | X | | ☐ |
| TSH | X | | | X | X | | ☐ |
| Alkaline Phosphatase | X | | | X | X | | ☐ |
| ApoE | X | | | X | | | ☐ |
| Factor V Leiden | X | | | X | | | ☐ |

## DIAGNOSTICS: The list of codes is non-inclusive but an excellent guide. PLEASE CHECK ALL THAT MAY APPLY.

IMPORTANT NOTE: Please code to the highest specificity w/o using unspecified codes unless necessary as they are not as convincing to insurance carriers nor do they best describe medical necessity as per guidelines. Thank you.

### Lipid

| | | |
|---|---|---|
| Pure hypercholesterolemia | 272.0 | ☐ |
| Mixed hyperlipidemia | 272.2 | ☐ |
| Other and unspecified hyperlipidemia | 272.4 | ☐ |
| Benign essential hypertension | 401.1 | ☐ |
| Unspecified essential hypertension | 401.9 | ☐ |
| Unspecified acquired hypothyroidism | 244.9 | ☐ |
| Hypertensive heart disease node range | 402.00 - 402.91 | ☐ |
| Hypertensive renal disease code range | 403.00 - 403.91 | ☐ |
| Hypertensive heart and renal disease | 404.00 - 404.93 | ☐ |

### Cardiovascular

| | | |
|---|---|---|
| Coronary atherosclerosis of unspecified type of vessel, native or graft | 414.00 | ☐ |
| Coronary atherosclerosis of native coronary artery | 414.01 | ☐ |
| Coronary atherosclerosis of autologous vein bypass graft | 414.02 | ☐ |
| Coronary atherosclerosis of nonautologous biological bypass graft | 414.03 | ☐ |
| Coronary atherosclerosis of artery bypass graft | 414.04 | ☐ |
| Coronary atherosclerosis of unspecified bypass graft | 414.05 | ☐ |
| Coronary atherosclerosis due to lipid rich plaque | 414.3 | ☐ |
| Atrial fibrillation | 427.31 | ☐ |
| Congestive heart failure | 428.0 | ☐ |
| CVA (stroke) | 434.91 | ☐ |
| Other peripheral vascular disease | 443.89 | ☐ |

### Diabetes Mellitus

| | | |
|---|---|---|
| Secondary diabetes mellitus w/o mention of complication, not stated as uncontrolled, or unspecified | 249.00 | ☐ |
| Secondary diabetes mellitus with mention of complication, uncontrolled | 249.01 | ☐ |
| Secondary diabetes mellitus with other specified manifestations, not stated as uncontrolled, or unspecified | 249.80 | ☐ |
| Diabetes mellitus without complication, type II or unspecified type, not stated as uncontrolled | 250.00 | ☐ |
| Diabetes mellitus without complication, type I, not stated as uncontrolled | 250.01 | ☐ |
| Diabetes mellitus without complication, type II or unspecified type | 250.02 | ☐ |
| Diabetes mellitus with renal manifestations, type II or unspecified type not stated as uncontrolled | 250.40 | ☐ |
| Diabetes mellitus with renal manifestations, type 1 , not stated  as uncontrolled | 250.41 | ☐ |
| Diabetes mellitus with renal manifestations, type II or unspecified type uncontrolled | 250.42 | ☐ |
| Diabetes mellitus with renal manifestations, type 1, uncontrolled | 250.43 | ☐ |

### Other Diagnosis Codes

| | | |
|---|---|---|
| Long-term (current) use of other medications (should not be used as primary Dx but excellent 2nd) | V58.69 | ☐ |
| If patient is on medications (insulin, anti-lipids etc) this code is important to add to main Dx | | |
| Chronic vascular insufficiency of intestine | 557.1 | ☐ |
| Other chronic non-alcoholic liver disease | 571.8 | ☐ |
| Unspecified chronic liver disease w/o mention of alcohol | 571.9 | ☐ |
| Other specified disorders of liver | 573.8 | ☐ |
| Unspecified disorders of liver | 573.9 | ☐ |
| Abnormal transaminase | 790.4 | ☐ |
| Abnormal alkaline phosphate | 790.5 | ☐ |
| Pancreatic disease range | 577.0 - 577.9 | ☐ |
| Chronic renal failure | 585 | ☐ |
| Other codes not listed: | | ☐ |

## PAYMENT INFORMATION

Visa ☐  Mastercard ☐  AMEX ☐  Discover ☐

Credit Card Number:

Name as it appears on credit card

Expiration Date

Signature

Amount of Payment in $

## Boston Heart Lab USE ONLY

Date received

Time

Initials

BHL Accession Number

BHL Patient ID Number

## Meeting Medical Necessity Guidelines for Lipid Testing

In an effort to assist our physicians, we have conducted extensive research on the medical coding of these test panels as it relates to providing the best options to prove medical necessity. As a result, we have added several proven medical necessity codes on our lab requisition (front page) for you to consider. In addition, we have added here as a guide for you, a table that describes the frequency of lipid testing and the rationales as it meets medical necessity paradigms.

### Lipid Testing Frequency Guide

| | |
|---|---|
| Once per year | Monitoring long term anti-lipid dietary or drug therapy or following patients with borderline high total or LDL cholesterol levels |
| Twice per year | For evaluating non-specific chronic liver abnormalities |
| Three times per year | After treatment goals have been achieved |
| Six times per year | For monitoring dietary or drug therapy during the first year |
| Six times per year | For marked elevations or changes to anti-lipid therapy due to inadequate initial patient response to dietary or drug therapy |

**Exhibit 2**

## How Know it Now Works

Boston Heart Diagnostics will submit a claim to your insurance carrier for laboratory services rendered. Once your claim has been processed, we will determine your maximum out-of-pocket responsibility. We will then mail you a statement for your total responsibility with a list of covered options.

You may also receive an Explanation of Benefits (EOB) from your insurance carrier, which details benefit payments associated with your insurance plan. An EOB is not a bill.

but should be kept for your records. Boston Heart Diagnostics may request a copy of your EOB if your insurance carrier does not send one to us directly.

Additionally, some insurance carriers, after receiving a claim from Boston Heart Diagnostics, may send a benefits check and the EOB directly to you. If you should receive a check for our services, it is your responsibility to forward the check and a copy of the EOB to:

**Boston Heart Diagnostics, PO Box 842856, Boston, MA 02284-2856**

## Know it Now Fee Schedule

| Test/Profile Name | Test Code | Know it Now Price |
|---|---|---|
| **Exclusive Tests** | | |
| Boston Heart Cholesterol Balance* | 501 | $6.00 |
| Boston Heart HDL Map* | 801 | $10.00 |
| Boston Heart Prediabetes Assessment*, Reflex | 420 | $5.00 |
| Boston Heart Statin Induced Myopathy (SLCO1B1) Genotype | 835 | $5.00 |
| Boston Heart Fatty Acid Balance* | 575 | $1.00 |
| **Liver, Kidney, Muscle, Thyroid and Other Tests** | | |
| Adiponectin | 407 | $1.00 |
| Albumin | 403 | $1.00 |
| Alkaline Phosphatase | 1004 | $1.00 |
| Alanine Aminotransferase (ALT) | 1003 | $1.00 |
| Aspartate Aminotransferase (AST) | 1002 | $1.00 |
| Blood Urea Nitrogen (BUN) | 1005 | $1.00 |
| C-Peptide | 410 | $1.00 |
| Creatine Kinase (CK) | 1001 | $1.00 |
| Creatinine | 1007 | $1.00 |
| Cystatin C | 1008 | $1.00 |
| Fibrinogen | 701 | $1.00 |
| Free T3 | 1017 | $1.00 |
| Free T4 | 1016 | $1.00 |
| Glucose | 401 | $1.00 |
| Glycated Serum Protein (GSP) | 409 | $1.00 |
| Hemoglobin A1c (HbA1c) | 404 | $1.00 |
| High Sensitivity C-Reactive Protein (hs-CRP) | 601 | $1.00 |
| Homocysteine | 603 | $1.00 |
| Insulin | 402 | $1.00 |
| Lipoprotein-Associated Phospholipase A2 (Lp-Pla2) | 602 | $2.00 |
| Myeloperoxidase (MPO) | 604 | $2.00 |
| N-Terminal Pro-Brain Natriuretic Peptide (NT-proBNP) | 1101 | $2.00 |
| Thyroid Stimulating Hormone (TSH) | 1006 | $2.00 |
| Total T3 | 1014 | $1.00 |
| Total T4 | 1015 | $1.00 |
| Uric Acid (UA) | 1009 | $1.00 |
| Vitamin D, 25-OH | 805 | $2.00 |

| Test/Profile Name | Test Code | Know it Now Price |
|---|---|---|
| **Lipid, Lipoprotein and Apolipoprotein Tests** | | |
| Boston Heart Cholesterol Balance | 501 | $6.00 |
| Boston Heart Cholesterol Balance (sterols only) | 509 | $5.00 |
| Boston Heart HDL Map | 801 | $10.00 |
| Boston Heart HDL Map (particles only) | 809 | $7.00 |
| Apolipoprotein A-I (ApoA-I) | 301 | $1.00 |
| Apolipoprotein B (ApoB) | 302 | $1.00 |
| Direct Low-Density Lipoprotein Cholesterol (LDL-C) | 222 | $1.00 |
| High-Density Lipoprotein Cholesterol (HDL-C) | 221 | $1.00 |
| LDL Particle Number (LDL-P) | 98006 | $2.00 |
| Lipoprotein(a) (Lp(a)) | 224 | $1.00 |
| Small Dense LDL Cholesterol (sdLDL-C) | 223 | $1.00 |
| Total Cholesterol (TC) | 101 | $1.00 |
| Triglycerides (TG) | 102 | $1.00 |
| **Genetic Tests** | | |
| Apolipoprotein E (ApoE) Genotype | 806 | $4.00 |
| Clopidogrel Response (CYP2C19) Genotype | 830 | $15.00 |
| Factor II (Prothrombin) Genotype | 826 | $3.00 |
| Factor V Leiden Genotype | 816 | $4.00 |
| MTHFR Genotype | 840 | $3.00 |
| Boston Heart Statin Induced Myopathy (SLCO1B1) Genotype | 835 | $5.00 |
| **Hormone Tests** | | |
| DHEA Sulfate (DHEA-S) | 1134 | $2.00 |
| Estradiol (E2) | 1128 | $2.00 |
| Follicle Stimulating Hormone (FSH) | 1122 | $1.00 |
| Free Testosterone | 1127 | $5.00 |
| Luteinizing Hormone (LH) | 1120 | $1.00 |
| Progesterone | 1124 | $1.00 |
| PSA, Total | 1123 | $1.00 |
| Sex Hormone Binding Globulin (SHBG) | 1130 | $2.00 |
| Total Testosterone | 1126 | $2.00 |

The Know it Now fee schedule will not apply to patients who are members of in-network

**Exhibit 3**

# EXPLANATION OF BENEFITS



ISSUE DATE: 01/25/17
EMPLOYEE: ███████████

GROUP: ███████████
GROUP ID: ███████████

CLAIM: 100-F15-216-Q22730-00
INCURRED: 12/07/16
PATIENT: ███████████



## HealthComp®
Third Party Administrator
PO BOX 45018, FRESNO, CA 93718-5018
Phone: 800.442.7247

| TREATMENT DATES | SERV CODE | CHARGE AMOUNT | NOT COVERED | REASON CODE | PPO/EPO DISCOUNT | COVERED AMOUNT | DEDUCTIBLE AMOUNT | CO-PAY AMOUNT | PCT | PAYMENT AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| A) 12/07-12/07/16 | 800 | 725.00 | 725.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| A) 12/07-12/07/16 | 800 | 41.00 | 41.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| | | 766.00 | 766.00 | | .00 | 0.00 | .00 | .00 | | .00 |

| | | |
|---|---|---|
| YOU HAVE SATISFIED $ .00 OF YOUR STANDARD DEDUCTIBLE | OTHER INSURANCE CREDITS | .00 |
| YOU HAVE SATISFIED $ .00 OF YOUR STANDARD FAMILY DEDUCTIBLE | TOTAL PAYMENT AMOUNT | .00 |
| YOU HAVE SATISFIED $ 200.00 OF YOUR PPO DEDUCTIBLE | PATIENT RESPONSIBILITY | 766.00 |
| YOU HAVE SATISFIED $ 500.00 OF YOUR PPO FAMILY DEDUCTIBLE | | |

## PAYMENT DISTRIBUTION

| CODE | PAYEE | AMOUNT | CHECK NUMBER | ACCOUNT |
|---|---|---|---|---|
| A) EMP) | BOSTON HEART DIAGNOSTICS CORPO ███████████ | | | B1963990Z02 |

## SERVICE CODE / REASON CODE

| SERVICE CODE | REASON CODE |
|---|---|
| 800 LABORATORY SERVICES | NN NON-NETWORK PROVIDERS ARE NOT COVERED |

## MESSAGES

THIS IS YOUR ONLY COPY.   PLEASE RETAIN FOR YOUR RECORDS.   4 of 6

# EXPLANATION OF BENEFITS

ISSUE DATE: 01/25/17

EMPLOYEE: ███████████

GROUP:
GROUP ID: ███████████

CLAIM: 100-F15-216-Q22731-02
INCURRED: 12/07/16
PATIENT: ███████████



HealthComp®
Third Party Administrators
PO BOX 45018, FRESNO, CA 93718-5018
Phone: 800.442.7247

| TREATMENT DATES | SERV CODE | CHARGE AMOUNT | NOT COVERED | REASON CODE | PPO/EPO DISCOUNT | COVERED AMOUNT | DEDUCTIBLE AMOUNT | CO-PAY AMOUNT | PCT | PAYMENT AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| A) 12/07-12/07/16 | 800 | 180.00 | 180.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| A) 12/07-12/07/16 | 800 | 46.00 | 46.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| A) 12/07-12/07/16 | 800 | 57.00 | 57.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| A) 12/07-12/07/16 | 800 | 109.00 | 109.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| A) 12/07-12/07/16 | 800 | 125.00 | 125.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| A) 12/07-12/07/16 | 800 | 131.00 | 131.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| A) 12/07-12/07/16 | 800 | 728.00 | 728.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| A) 12/07-12/07/16 | 800 | 76.00 | 76.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| | | 1452.00 | 1452.00 | | .00 | 0.00 | .00 | .00 | | .00 |

YOU HAVE SATISFIED $      .00 OF YOUR STANDARD DEDUCTIBLE
YOU HAVE SATISFIED $      .00 OF YOUR STANDARD FAMILY DEDUCTIBLE
YOU HAVE SATISFIED $   200.00 OF YOUR PPO DEDUCTIBLE
YOU HAVE SATISFIED $   500.00 OF YOUR PPO FAMILY DEDUCTIBLE

| | |
|---|---|
| OTHER INSURANCE CREDITS | .00 |
| TOTAL PAYMENT AMOUNT | .00 |
| PATIENT RESPONSIBILITY | 1452.00 |

## PAYMENT DISTRIBUTION

| CODE | PAYEE | AMOUNT | CHECK NUMBER | ACCOUNT |
|---|---|---|---|---|
| A) | BOSTON HEART DIAGNOSTICS | | | B1963990Z01 |
| EMP) | ███████████ | | | |

| S E R V I C E   C O D E | R E A S O N   C O D E |
|---|---|
| 800 LABORATORY SERVICES | NN NON-NETWORK PROVIDERS ARE NOT COVERED |

## M E S S A G E S

THIS IS YOUR ONLY COPY.   PLEASE RETAIN FOR YOUR RECORDS.   3 of 6

# EXPLANATION OF BENEFITS

ISSUE DATE: 01/25/17

EMPLOYEE: ███████

GROUP: ███████
GROUP ID: ███████

CLAIM: 100-F15-216-Q22731-00
INCURRED: 12/07/16
PATIENT: ███████



HealthComp®
Third Party Administrators
PO BOX 45018, FRESNO, CA 93718-5018
Phone: 800.442.7247

| TREATMENT DATES | SERV CODE | CHARGE AMOUNT | NOT COVERED | REASON CODE | PPO/EPO DISCOUNT | COVERED AMOUNT | DEDUCTIBLE AMOUNT | CO-PAY AMOUNT | PCT | PAYMENT AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| A) 12/07-12/07/16 | 800 | 88.00 | 88.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| A) 12/07-12/07/16 | 800 | 124.00 | 124.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| A) 12/07-12/07/16 | 800 | 31.00 | 31.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| A) 12/07-12/07/16 | 800 | 22.00 | 22.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| A) 12/07-12/07/16 | 810 | 451.00 | 451.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| A) 12/07-12/07/16 | 810 | 209.00 | 209.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| A) 12/07-12/07/16 | 810 | 166.00 | 166.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| A) 12/07-12/07/16 | 810 | 256.00 | 256.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| | | 1347.00 | 1347.00 | | .00 | 0.00 | .00 | .00 | | .00 |

| | |
|---|---|
| YOU HAVE SATISFIED $    .00 OF YOUR STANDARD DEDUCTIBLE | |
| YOU HAVE SATISFIED $    .00 OF YOUR STANDARD FAMILY DEDUCTIBLE | |
| YOU HAVE SATISFIED $ 200.00 OF YOUR PPO DEDUCTIBLE | |
| YOU HAVE SATISFIED $ 500.00 OF YOUR PPO FAMILY DEDUCTIBLE | |

| | |
|---|---|
| OTHER INSURANCE CREDITS | .00 |
| TOTAL PAYMENT AMOUNT | .00 |
| PATIENT RESPONSIBILITY | 1347.00 |

## PAYMENT DISTRIBUTION

| CODE | PAYEE | AMOUNT | CHECK NUMBER | ACCOUNT |
|---|---|---|---|---|
| A) | BOSTON HEART DIAGNOSTICS | | | B1963990Z01 |
| EMP) | ███████ | | | |

### S E R V I C E   C O D E

800 LABORATORY SERVICES
810 GENETIC TESTING

### R E A S O N   C O D E

NN NON-NETWORK PROVIDERS ARE NOT COVERED

### M E S S A G E S

THIS IS YOUR ONLY COPY.  PLEASE RETAIN FOR YOUR RECORDS.   2 of 6

# EXPLANATION OF BENEFITS

ISSUE DATE: 01/25/17

EMPLOYEE:

GROUP:
GROUP ID:

CLAIM: 100-F15-216-Q22731-03
INCURRED: 12/07/16
PATIENT:



HealthComp®
Third Party Administrators
PO BOX 45018, FRESNO, CA 93718-5018
Phone: 800.442.7247

| TREATMENT DATES | SERV CODE | CHARGE AMOUNT | NOT COVERED | REASON CODE | PPO/HPO DISCOUNT | COVERED AMOUNT | DEDUCTIBLE AMOUNT | CO-PAY AMOUNT | PCT | PAYMENT AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| A) 12/07-12/07/16 | 800 | 75.00 | 75.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| A) 12/07-12/07/16 | 800 | 119.00 | 119.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| A) 12/07-12/07/16 | 800 | 85.00 | 85.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| A) 12/07-12/07/16 | 800 | 50.00 | 50.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| A) 12/07-12/07/16 | 800 | 52.00 | 52.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| | | 381.00 | 381.00 | | .00 | 0.00 | .00 | .00 | | .00 |

YOU HAVE SATISFIED $      .00 OF YOUR STANDARD DEDUCTIBLE
YOU HAVE SATISFIED $      .00 OF YOUR STANDARD FAMILY DEDUCTIBLE
YOU HAVE SATISFIED $   200.00 OF YOUR PPO DEDUCTIBLE
YOU HAVE SATISFIED $   500.00 OF YOUR PPO FAMILY DEDUCTIBLE

| | |
|---|---|
| OTHER INSURANCE CREDITS | .00 |
| TOTAL PAYMENT AMOUNT | .00 |
| PATIENT RESPONSIBILITY | 381.00 |

## PAYMENT DISTRIBUTION

| CODE | PAYEE | AMOUNT | CHECK NUMBER | ACCOUNT |
|---|---|---|---|---|
| A) EMP) | BOSTON HEART DIAGNOSTICS | | | B1963990Z01 |

| SERVICE CODE | REASON CODE |
|---|---|
| 800 LABORATORY SERVICES | NN NON-NETWORK PROVIDERS ARE NOT COVERED |

## MESSAGES

THIS IS YOUR ONLY COPY.   PLEASE RETAIN FOR YOUR RECORDS.   6 of 6

# EXPLANATION OF BENEFITS

ISSUE DATE: 01/25/17

EMPLOYEE: ██████████████████

GROUP: ██████████████████
GROUP ID: ██████████████████

CLAIM: 100-F15-216-Q22731-01
INCURRED: 12/07/16
PATIENT: ████████████████

## HealthComp®

This Form is Not a Bill.
PO BOX 45018, FRESNO, CA 93718-5018
Phone: 800.442.7247

| TREATMENT DATES | SERV CODE | CHARGE AMOUNT | NOT COVERED | REASON CODE | PPO/EPO DISCOUNT | COVERED AMOUNT | DEDUCTIBLE AMOUNT | CO-PAY AMOUNT | PCT | PAYMENT AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| A) 12/07-12/07/16 | 810 | 235.00 | 235.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| A) 12/07-12/07/16 | 800 | 92.00 | 92.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| A) 12/07-12/07/16 | 800 | 190.00 | 190.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| A) 12/07-12/07/16 | 800 | 37.00 | 37.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| A) 12/07-12/07/16 | 800 | 45.00 | 45.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| A) 12/07-12/07/16 | 800 | 55.00 | 55.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| A) 12/07-12/07/16 | 800 | 49.00 | 49.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| A) 12/07-12/07/16 | 800 | 90.00 | 90.00 | NN | .00 | 0.00 | .00 | .00 | 80 | .00 |
| | | 793.00 | 793.00 | | .00 | 0.00 | .00 | .00 | | .00 |

| | |
|---|---|
| YOU HAVE SATISFIED $ .00 OF YOUR STANDARD DEDUCTIBLE | |
| YOU HAVE SATISFIED $ .00 OF YOUR STANDARD FAMILY DEDUCTIBLE | |
| YOU HAVE SATISFIED $ 200.00 OF YOUR PPO DEDUCTIBLE | |
| YOU HAVE SATISFIED $ 500.00 OF YOUR PPO FAMILY DEDUCTIBLE | |

| | |
|---|---|
| OTHER INSURANCE CREDITS | .00 |
| TOTAL PAYMENT AMOUNT | .00 |
| PATIENT RESPONSIBILITY | 793.00 |

## PAYMENT DISTRIBUTION

| CODE | PAYEE | AMOUNT | CHECK NUMBER | ACCOUNT |
|---|---|---|---|---|
| A) | BOSTON HEART DIAGNOSTICS | | | B1963990Z01 |
| EMP) | ████████████████ | | | |

## SERVICE CODE

810 GENETIC TESTING
800 LABORATORY SERVICES

## REASON CODE

NN NON-NETWORK PROVIDERS ARE NOT COVERED

## MESSAGES

THIS IS YOUR ONLY COPY.  PLEASE RETAIN FOR YOUR RECORDS.   5 of 6

**Exhibit 4**

# FUTURE Local Coverage Determination (LCD):
# MolDX: Biomarkers in Cardiovascular Risk Assessment (L36129)

Links in PDF documents are not guaranteed to work. To follow a web link, please use the MCD Website.



Please note: Future Effective Date.

# Contractor Information

| Contractor Name | Contract Number | Contract Type | Jurisdiction |
|---|---|---|---|
| Palmetto GBA | 11201 | A and B and HHH MAC | J - M |

Back to Top

# LCD Information

## Document Information



LCD ID
L36129

Original ICD-9 LCD ID
N/A

LCD Title
MolDX: Biomarkers in Cardiovascular Risk Assessment

AMA CPT / ADA CDT / AHA NUBC Copyright Statement
CPT only copyright 2002-2014 American Medical Association. All Rights Reserved. CPT is a registered trademark of the American Medical Association. Applicable FARS/DFARS Apply to Government Use. Fee schedules, relative value units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained herein.

The Code on Dental Procedures and Nomenclature (Code) is published in Current Dental Terminology (CDT). Copyright © American Dental Association. All rights reserved. CDT and CDT-2010 are trademarks of the American Dental Association.

Jurisdiction
South Carolina

Original Effective Date
For services performed on or after 10/05/2015

Revision Effective Date
N/A

Revision Ending Date
N/A

Retirement Date
N/A

Notice Period Start Date
08/20/2015

Notice Period End Date
10/04/2015

UB-04 Manual. OFFICIAL UB-04 DATA SPECIFICATIONS MANUAL, 2014, is copyrighted by American Hospital Association ("AHA"), Chicago, Illinois. No portion of OFFICIAL UB-04 MANUAL may be reproduced, sorted in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording or otherwise, without prior express, written consent of AHA." Health Forum reserves the right to change the copyright notice from time to time upon written notice to Company.

CMS National Coverage Policy Title XVIII of the Social Security Act (SSA), §1862(a)(1)(A), states that no Medicare payment shall be made for items or services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."

Title XVIII of the Social Security Act, §1833(e), prohibits Medicare payment for any claim lacking the necessary documentation to process the claim.

42 Code of Federal Regulations (CFR) §410.32 Diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests: Conditions.

CMS Internet Online Manual Pub. 100-02 (Medicare Benefit Policy Manual), Chapter 15, Section 80, "Requirements for Diagnostic X-Ray, Diagnostic Laboratory, and Other Diagnostic Tests"

CMS Internet-Only Manuals, Publication 100-04, Medicare Claims Processing Manual, Chapter 16, §50.5 Jurisdiction of Laboratory Claims, 60.12 Independent Laboratory Specimen Drawing, 60.2. Travel Allowance.

CMS Internet Online Manual Pub. 100-04 (Medicare Claims Processing Manual), Chapter 23 (Section 10) "Reporting ICD Diagnosis and Procedure Codes"


Coverage Guidance
**Coverage Indications, Limitations, and/or Medical Necessity**

**Indications and Limitations**

Medicare coverage for CV risk assessment is limited to the basic lipid panel (total cholesterol, high density lipoprotein–cholesterol (HDL-C), triglycerides, and low density lipoprotein-cholesterol (LDL-C) or any one component of the panel) under NCD 90.1.

CV risk assessment panels, consisting of various combinations of biochemical, immunologic, hematologic, and molecular tests, is considered screening when performed on an asymptomatic patient, and, as such, are not a Medicare benefit. These CV risk assessment panels are not medically reasonable and necessary if performed on a patient with existing risk factors including but not limited to pre-diabetes or diabetes, smoking, hypertension or hyperlipidemia because these panels are not specific to a patient's lipid abnormality or disease. Medicare coverage is limited to the use of specific biomarkers that may be used to characterize a given lipid abnormality or disease, to determine a treatment plan, or to assist with intensification of therapy, not as part of a broad CV risk assessment panel. The following biomarkers, when they are included in a CV risk assessment panel, are non-covered:

- Lipoprotein subclasses;
- LDL particles;
- Intermediate density lipoproteins;
- High density lipoprotein AI9LpAI and AI/AII;
- Lipoprotein(a);
- Apolipoprotein B (Apo B), apo A-I and apo E;
- Lipoprotein-associated phospholipase A2 (Lp-PLA2)
- BNP
- Cystatin C
- Thrombogenic/hematologic actors
- Interleukin-6 (IL-6), tissue necrosis factor- a (TNF- a) , plasminogen activator inhibitor-1 (PAI-1) and IL-6 promoter polymorphism
- Free fatty acids
- Visfatin, angiotensin-converting enzyme 1 (ACE2) and serum amyloid A

- Microalbumin
- Myeloperoxidase (MPO)
- Homocysteine and methylenetetrahydrofolate reductase (MTHFR) mutation testing
- Uric acid
- Vitamin D
- White blood cell count
- Long-chain omega-3 fatty acids in red blood cell membranes
- Gamma-glutamyltransferase (GGT)
- Genomic profiling including CardiaRisk angiotensin gene
- Leptin, ghrelin, adiponectin and adipokines including retinol binding protein 4 (RBP4) and resistin
- Inflammatory markers including VCAM-1, P-selectin (PSEL) and E-selectin (ESEL)
- Cardiovascular risk panels

In addition, at the current time, there is no literature to support immunologic, hematologic or molecular biomarker testing for CV risk assessment either as part of a CV risk panel or when ordered individually.

Note #1: There is no Medicare benefit for screening CV risk assessment testing for asymptomatic (without signs or symptoms of disease) patients. Screening asymptomatic patients for cardiovascular risk is statutorily excluded by Medicare and will not be addressed in this policy.

Note #2: FDA approval/clearance means that a test/assay has analytical and clinical validity. The FDA does not review clinical utility (that the test/assay demonstrates improved patient outcomes). To meet Medicare's "reasonable and necessary" criteria for coverage, a test/assay must have proven clinical utility.

## Traditional vs Non-traditional CV Risk Assessment

During the last two decades the interest in CV biomarkers as early screening tools has risen dramatically, largely fueled by the recognition that traditional CV risk factors (diabetes, smoking, hypertension and hyperlipidemia) do not fully explain individual variation in CV risk, and by advances in genetic and molecular research. Risk assessment for determining the 10-year risk for developing CHD is traditionally carried out using the Framingham risk score

(http://www.nhlbi.nih.gov/guidelines/cholesterol/atp3xsum.pdf) or other classification that incorporates a lipid profile in the calculation.

Despite the Framingham risk-scoring tool, clinicians have sought non-traditional lipid and other biomarker measurements to predict CV events. The most promising biomarkers are the ones that closely correlate with the pathophysiological process of the disease. In general, there is evidence that some of these biomarkers may alter risk categorization (higher or lower) compared to traditional risk prediction, but it has not been established that changes in categorization provides clinically actionable information beyond that of traditional lipid measures. In addition, no study has provided high-quality evidence that measurement of non-traditional lipid and other biomarkers leads to changes in management that improve health outcomes.

To provide clinically useful knowledge, a biomarker should meet the following criteria:

- Adds clinical knowledge that improves patient outcomes (criteria for Medicare "reasonable and necessary");
- Provides risk information that is independent of established predictors;
- Is easy to measure and interpret in the clinical setting; and
- Is accurate, reproducible and standardized.

From a purely economic point of view, one would also expect a favorable cost-benefit ratio, although this does not carry significance with Medicare coverage determinations.

## High-sensitivity C-reactive protein (hs-CRP)

CRP is a protein produced in the liver during episodes of acute inflammation or infection. The hs-CRP test measures CRP that is in the normal range for healthy people, and is used to distinguish people with low normal levels from those with high normal levels. In recent years, prospective epidemiologic studies have demonstrated that inflammation is essential for CV disease pathogenesis and that high normal levels of hs-CRP correlate with an increased risk of CV events such as myocardial infarction (MI), stroke, sudden cardiac death and peripheral

vascular disease (CVD) even when lipid levels are within acceptable ranges. The American Heart Association (AHA) and the US Centers for Disease Control and Prevent (CDC) recommend averaging two hs-CRP levels obtained two weeks apart. Based on hs-CRP test results, they recognize: low (<1.0 mg/L), average (1.0-3.0 mg/L) and high (>3.0 mg/L) risk groups.

In 2009, the US Preventive Services Task Force (USPSTF) report on the use of non-traditional risk factors noted there is insufficient evidence to recommend the use of non-traditional risk factors to screen asymptomatic individuals with no history of CHD to prevent CHD events. The non-traditional risk factors in their recommendation included: hs-CRP, ankle-brachial index (ABI), leukocyte count, fasting blood glucose level, periodontal disease, carotid intima-media thickness, coronary artery calcification (CAC) score on electron beam computerized tomography(EBCT), homocysteine level, and lipoprotein(a) level. The USPSTF stated there is insufficient evidence to determine the percentage of intermediate-risk individuals who would be reclassified by screening with non-traditional risk factors, other than hs-CRP or ABI. For individuals re-classified as high-risk by hs-CRP or ABI, data are not available to determine whether they benefit from additional treatment. They note the potential harms resulting from re-classification including the use of medications without proven benefit and psychological effects. The USPSTF stated that clinicians should continue to use the Framingham model to assess CHD risk and guide risk-based preventive therapy.

While data from the Physicians' Health Study and Framingham Heart Study have shown that hs-CRP measurements may result in reclassification of an individual's risk compared to standard risk prediction models, meta-analysis including data from the second Northwick Park Heart Study (NPHS II) and the Edinburgh Artery Study concluded that the ability of hs-CRP to reclassify risk correctly was modest and inconsistent.

The Jupiter trial, a randomized, double-blind, placebo-controlled trial of the use of rosuvastatin vs placebo in the primary prevention of CVD in patients without diabetes with LDL-C <130mg/dL and CRP =2 mg/dL was associated with a significant reduction in the primary endpoint of CV events. These findings suggest that hs-CRP measurement in highly preselected patients may have important clinical implications. However, the Jupiter study was not a trial of hs-CRP because individuals with unknown or low hs-CRP concentrations were not studied. Despite evidence that elevated hs-CRP levels are associated with increased risk of CHD, it has not been determined whether hs-CRP is causally related to CHD.

In 2010, The American College of Cardiology Foundation and the American Heart Association (ACCF/AHA) published guidance as to when and in whom to measure blood levels of hs-CRP. The guidance states that hs-CRP levels may assist in the selection of patients for statin therapy according to the following criteria (Class IIa; Level of evidence (LOE): B):

- Men >50 years of age, or women >60 years of age or older,
- LDL-C <130 mg/dL
- Patients not on lipid-lowering, hormone replacement, or immunosuppressant therapy,
- Patients without clinical CHD, diabetes, chronic kidney disease, severe inflammatory conditions, or contraindications to statins


For example, a patient may appear to have a low or low-moderate elevated risk of CV events based on traditional risk factor scoring with cholesterol levels, weight, level of exercise, smoking history, diabetes and hypertension. However, an elevated hs-CRP level would indicate that the cardiac risk may be substantially greater than traditional risk factors suggest, and that treatment might be considered. For patients who are already known to have high risk, according to current recommendations, hs-CRP levels will not add any substantially new information, since the patient should already be receiving all available therapy including statins to reduce the risk.

The ACCF/AHA recommended measurement of hs-CRP for CV risk assessment in asymptomatic intermediate-risk men 50 years of age or younger, or women 60 years of age or younger (Class IIb; LOE B). Since screening (asymptomatic patient) is statutorily excluded from coverage, hs-CRP testing for these individuals is not a Medicare benefit. They found no benefit for hs-CRP testing in asymptomatic high-risk adults or men and women below the ages stated above. (Class III; LOE B).

The Canadian Cardiovascular Society guidelines recommend hs-CRP testing in men older than 50 and women older than 60 years of age who are at intermediate risk (10-19%) according to their Framingham risk score and who do not otherwise qualify for lipid-lowering therapy. They also state that subjects who meet Jupiter criteria can be considered for treatment based on the results of that study.

In the National Academy of Clinical Biochemistry's practice guidelines on emerging CV risk factors, only hs-CRP met the stated criteria as a biomarker for risk assessment in primary prevention. They recommended:

- If the 10-year predicted risk, after standard global risk assessment, is < 5%, hs-CRP should not be measured.
- If the 10-year risk is 5-10%, it is expected that 10% might be reclassified to a higher risk group with the test.
- If the risk is intermediate (10-20%), and uncertainty remains as to the use of preventive therapies such as statins or aspirin, then hs-CRP measurement might be useful for further stratification into a higher or lower risk category.

The NACB also recommended that:

- Therapies based on hs-CRP should be based on a clinician's clinical judgment because benefits of such treatment are uncertain;
- There is insufficient data that therapeutic monitoring using hs-CRP over time is useful to evaluate effects of treatment in primary prevention;
- The utility of hs-CRP levels to motivate patients to improve lifestyle behaviors has not been demonstrated;
- Evidence is inadequate to support concurrent measurement of other inflammatory markers in addition to hs-CRP for coronary risk assessment.

In 2012, the American Association of Clinical Endocrinologist gave a 2b recommendation for the use of hs-CRP to stratify borderline CV risk in patients with a standard risk assessment, or those with an LDL-C <130 mg/dL. A European consensus guideline (2012) recommended that hs-CRP testing should not be measured in asymptomatic low- and high-risk patients, and gave a weak recommendation to further stratify patient with an intermediate risk of CVD.

The AHA's statement on non-traditional risk factors and biomarkers in CV disease in youth notes "There is currently no clinical role for measuring CRP routinely in children when assessing or considering therapy for CVD risk factors." The AHA also state that it is not clear whether high hs-CRP levels during childhood and adolescence lead to an increased risk of CVD in adult life. While lifestyle changes have been shown to decrease hs-CRP in children, and statins reduce CRP in adults, the AHA indicates there is minimal information available on the effect of statins on hs-CRP in children and whether lowering hs-CRP in children mitigates preclinical disease or CVD in adulthood. Similarly, the National Heart, Blood and Lung Institute (NHBLI) guideline on CV risk in children and adolescents found insufficient evidence to recommend hs-CRP testing in these patient groups.

In summary, this contractor will cover hs-CRP when the patient meets the following criteria:

1. Men must be > 50 years of age; women must be > 60 years of age; **and**
2. Patient has intermediate CV risk (10-20% risk of CVD per 10 years using the Framingham point score); **and**
3. Patient has LDL-C between 100-130 mg/dL; **and**
4. Patient has two or more CHD major risk factors, including
   - Age (Men> 45 years; Women >55 years
   - Current cigarette smoking
   - Family history of premature CHD (CHD in male first degree relative <55; CHD in female fist degree relative <65 years of age)
   - Hypertension (Systolic > 140 mm Hg, or on anti-hypertensive medication
   - Low HDL-C (<40 mg/dL)

All other indications for hs-CRP testing , including therapeutic monitoring to evaluate effects of treatment and utility to motivate patient to improve lifestyle behaviors, are investigational and therefore not covered by Medicare.

**Lipoprotein subclasses**

Lipoprotein subclass determination based on density, electric charge and other physical chemistry aspect of particles such as nuclear magnetic resonance allow more specific characterization of the major subclasses (VLDL, LDL, IDL and HDL). Studies showed that small, dense LDL particles were highly associated with the occurrence of CVD and diabetes.

**LDL Particles (LDL-P) (aka LDL or Lipoprotein Particles or Particle Number, LDL or Lipid Subfractionation, Lipid Phenotyping, Nuclear Magnetic Resonance or NMR Profile)**

Small dense LDL with elevated triglyceride levels and low HDL-cholesterol levels constitute the "atherogenic lipoprotein phenotype" form of dyslipidemia that is a feature of type II diabetes and the metabolic syndrome. Measurement of LDL particle density has been proposed as a technique to further risk stratification in patients with elevated LDL levels or for patients with normal LDL levels who have other high risk factors for CAD, or to predict response to a particular therapy.

Although great progress has been made in the development of refined lipoprotein assessment and such measurements have helped in understanding the atherosclerotic process, it is not known whether measurements beyond traditional lipids can identify CV risk subgroups and how treatment would differ based on subgroup classification. Furthermore, it is not known whether this additional information helps the health care provider to identify with greater precision and accuracy the person who will develop clinical or subclinical CVD.

The NACB does not recommend testing as there is insufficient data that measurement of lipoprotein subclasses can identify CV risk subgroups, how treatment would differ based on subgroup classification and whether, over time, measurement is useful to evaluate the effects of treatments. In addition, the 2010 ACCF/AHA guidelines for assessment of lipoprotein, other lipoprotein parameters and modified lipids state that "measurement of lipid parameters, including lipoproteins, apolipoproteins, particle size, and density, beyond standard fasting lipid profile is not recommended for cardiovascular disease risk assessment in asymptomatic adults."

Unlike lipoprotein size or subclass measures, which seek to improve CV risk assessment beyond conventional lipid testing, LDL particle number tests (NMR LDL-P and apoB) are simply an alternate measure of LDL quantity. Current data supports the ability of LDL particle number to provide clinically actionable information beyond traditional lipid measures to adjudicate individual response to treatment and guide adjustment in therapy. In addition, recent data demonstrate that patients with established CHD, stroke, TIA, peripheral arterial or diabetes achieving NMR LDL-P < 1000 nmol/L during the course of their normal medical care experienced a significant 22-25% reduction in risk of CV events (myocardial infarction, revascularization, angina and stroke) versus patients managed to LDL-C < 100 mg/dL at 12, 24, and 36 months follow-up.

LDL particle number (NMR LDL-P), rather than LDL size or subclass, has been shown to be significantly associated with CV risk independent of traditional lipid and established risk factors. The American Association of Clinical Endocrinologists (AACE), the National Lipid Association (NLA), the American Diabetes Association (ADA) in conjunction with the American College of Cardiology (ACC), and the American Association of Clinical Chemistry (AACC) have developed consensus position statement on lipoprotein particle management in individuals at risk for CVD. Due to the prevalence of discordantly elevated LDL-P despite achieving low LDL-C and non-HDL-C values, each endorses use of LDL particle number to evaluate LDL response and aid decision making regarding potential adjustment of therapy. The 2013 AACE Comprehensive Diabetes Management Algorithm, as well as the 2015 joint AACE/American College of Endocrinology Clinical Practice Guidelines for Comprehensive Diabetes Mellitus Care, advocate specific LDL particle number goals for statin treated diabetic patients at high CV risk.

## Intermediate Density Lipoproteins (Remnant Proteins)

Intermediate density lipoproteins (IDLs) have a density that falls between LDLs and VLDLs, and may be referred to as remnant lipoproteins because they vary in size and contain varying proportion of triglycerides and cholesterol. Although there is abundant evidence the remnant lipoproteins are atherogenic, and a risk factor for CAD, there is no evidence how testing improves patient outcomes.

## High Density Lipoprotein (HDL) Subclass (Lipoprotein AI 9LpAI) and Lipoprotein AI/AII (LpAI/AII) and/or HDL3 and HDL2

HDL cholesterol (HDL-C) is the risk indicator most often used in associated with CHD risk. HDL subfractions have been used for risk prediction. However data is lacking how the subfractions aid in the diagnosis and management of CHD. Neither the NCEP nor ACCF/AHA guidelines recommend the routine measurement of HDL subspecies in CHD risk assessment.

## Lipoprotein(a) (Lp(a))

Lp(a) is a modified form of LDL in which a large glycoprotein, apolipoprotein(a) is bound to apolipoprotein B. It promotes foam cell formation and the deposition of cholesterol in atherosclerotic plaques, and, because it is structurally similar to plasminogen, Lp(a) may contribute to clot formation. However, the complete role of lipoprotein(a) is not fully understood.

There is no standardized scale for measuring Lp(a) because there is no level that is considered "normal". Because Lp(a) levels are controlled predominantly by genes, cholesterol-lowering drugs have little effect on lowering Lp(a) levels. Elevated Lp(a) is considered an independent risk factor for cardiovascular events, including myocardial infarction, stroke, CVD, vein graft restenosis, and retinal arterial occlusion and may be used to identify individuals who might benefit from more aggressive treatment of other risk factors. However, regardless of the association between Lp(a) and CV disease, there is no data to suggest that more aggressive risk factor modification improves

The NACB specifies that Lp(a) screening is not warranted for primary prevention and assessment of cardiovascular risk. They comment that Lp(a) measurement may be done at the physician's discretion if the risk is intermediate (10%–20%) and uncertainty remains as to the use of preventive therapies such as statins or aspirin (Recommendation – IIb; LOE – C). They further note there is insufficient evidence to support therapeutic monitoring of Lp(a) concentrations for evaluating the effects of treatment. Due to the level of evidence, Palmetto GBA will not cover testing for intermediate risk because there is no data to suggest that more aggressive risk factor modification improves patient health outcomes.

Similarly, the 2010 ACCF/AHA guidelines conclude that apolipoproteins is not recommended for CV disease risk assessment in asymptomatic adults. UpToDate notes that Lp(a) is a modest, independent risk factor for CVD, especially MI, but notes there are no clinical trials that have adequately tested the hypothesis that Lp(a) reduction reduces the incidence of first or recurrent CVD events.

## Apolipoprotein B (Apo B), Apolipoprotein A-I (Apo AI), and Apolipoprotein E (Apo E)

Apo B is a constituent of LDL particles, and serves as an indirect measurement of the number of LDL particles. Consequently, elevated levels of Apo B suggest increased levels of small dense LDL particles that are thought to be atherogenic.

Apo AI is the major protein constituent of HDL-C. However, its measurement has not been established as a clinically useful test in determining clinical therapy for patients with CAD or dyslipemia at the current time.

While Apo B and Apo A-I are thought to be the main structural proteins of atherogenic and anti-artherogenic lipoproteins and particles, testing for these compounds has not been validated as a tool for risk assessment. As such, the 2010 ACCF/AHA guidelines indicate that apolipoproteins testing is not recommended for CV risk assessment in asymptomatic adults. However, AACE recommends apoB testing to assess residual risk in patients for CAD (even when LDL-C levels are controlled) in patient when the triglyceride concentration is >150 mg/dL or the HDL-C concentration is <40 mg/dL. Therefore, this contractor will cover apoB testing in patients with triglyceride or HDL-C concentrations as specified by AACE.

Apo E, the major constituent of VLDL and chylomicrons, acts as the primary binding protein for LDL receptors in the liver and is thought to play a role in lipid metabolism. Although some individuals hypothesize that Apo E genotypes may be useful in the selection of drug therapy, the value of Apo E testing in the diagnosis and management of CHD is insufficient and needs further evaluation.

The National Cholesterol Education Program (NCEP) expert panel concluded that Apo AI is carried in HDL and it is usually low when HDL is reduced. A low Apo AI thus is associated with increased risk of CHD, but not independently of low HDL. Whether it has independent predictive power beyond HDL-C is uncertain and its measurement is not recommended for routine risk assessment in Adult Treatment Panel (ATP III) Guidelines.

## Testing for Lipoproteins

### Apolipoproteins

Apolipoproteins are measured in routine clinical laboratories with the use of immunonephelometric or immunoturbidimetric assays. ApoB reflects the number of potentially atherogenic lipoprotein particles because each particle of VLDL, IDL, LDL and lipoprotein(a) particle carries on its surface 1 Apo B100 protein. Most of plasma Apo B is found in LDL particles. HDL particles do not carry Apo B. Instead they carry Apo AI, which does not correspond directly to the concentration of HDL particles in a 1-to-1 fashion.

### LDL Gradient Gel Electrophoresis (GGE) (used by Berkeley Heart Lab, Berkeley, CA)

GGE is the most commonly used lab technique to measure LDL particle density. It has been promoted as an important criteria of CHD risk, and as a guide to drug and diet therapy in patients with CAD. While the measurement of LDL subclass patterns may be useful in elucidating possible atherogenic dyslipemia in patients without abnormal total cholesterol, HDL, LDL and triglycerides, there is inadequate evidence that LDL sub-classification by GGE improves outcomes in patients with CV disease.

### Density Gradient Ultracentrifugation (DGU) (used by Atherotec Inc, Birmingham, AL)

The Vertical Auto Profile (VAP) test measures the relative distribution of cholesterol within various lipoprotein subfractions, quantifying the cholesterol content in the VLDL, IDL, LDL, lipoprotein(a) and HDL subclasses. It includes components (e.g., total cholesterol, direct measured LDL-C, HDL-C and triglycerides), LDL density (i.e. pattern A versus pattern B), IDL, HDL sub types, VLDL density and Lp(a), and non-lipid CV risk assessment

biomarkers including hs-CRP, homocysteine, Lp-PLA2, apoE genotype, vitamin D, cystatin and NT-proBNP.

Case 1:12-cv-01422-RBW Document 40 Filed 10/04/17 Page 69 of 82

## Nuclear Magnetic Resonance Spectroscopy

In this method (NMR LipoProfile® is FDA cleared and available from LipoScience Inc, Raleigh, NC) particle concentrations of lipoprotein subfractions of different size are obtained from the measured amplitudes of their lipid methyl group NMR signals. Lipoprotein particle sizes are then derived from the sum of the diameter of each subclass multiplied by its relative mass percentage based on the amplitude of its methyl NMR signal.

Note: FDA clearance does not mean the test has clinical utility.

## Ion-Mobility Analysis

This method (available from Quest Diagnostics Inc, Madison, NJ) measures both the size and concentration of lipoprotein particle subclasses on the basis of gas-phase differential electric mobility.

## Summary of Lipoprotein Testing

It the current time, none of the above tests for lipoproteins have better predictive strength than total/HDL-C ratio and there has been no clear benefit for measuring particle number in most studies to date. Additional research is needed to establish the utility of following changes in lipoproteins as a therapeutic target and determine if any subgroups of patients benefit. Consequently, lipoprotein testing is considered investigational and not covered.

## Lipoprotein-Associated Phospholipase A2 (Lp-PLA2)

Lp-PLA2 is also known as platelet activating factor acetylhydrolase. This enzyme hydrolyzes phospholipids and is primarily associated with LDLs. It has been suggested that this enzyme has a proinflammatory role in the development of atherosclerosis. Studies show that Lp-PLA2 is an independent predictor of CV risk but fail to demonstrate improved health outcomes. To improve outcomes, studies must demonstrate how risk factors improve risk classification and change in physician practice to improve patient outcomes.

The NCEP ATP III panel concluded that routine measurement of inflammatory markers (including Lp-PLA2) for the purpose of modifying LDL-cholesterol goals in primary prevention is not warranted. In the 2010 ACCF/AHA guidelines for assessment of CV risk, the experts concluded "lipoprotein-associated phospholipase (Lp-PLA2) might be reasonable for cardiovascular risk assessment in intermediate risk asymptomatic adults". However, at the current time, it is not known whether Lp-PLA2 concentrations are clinically effective for motivating patients, guiding treatment, or improving outcomes.

## B-type Natriuretic Peptide (BNP)

BNP and NT-proBNP, hormones produced by cardiocytes in response to hemodynamic stress, have emerged as preferred biomarkers for assessing heart-related stress. These hormones play a role in the acute setting for use in diagnosing decompensated heart failure. There is evidence that these hormones provide prognostic information of mortality and first CV events beyond traditional risk factors. However, there is currently no evidence that treatment or intervention based on the increased risk implied by these biomarkers improves patient outcomes.

## Cystatin C

Cystatin C, encoded by the CST3 gene, is a small serine protease inhibitor protein secreted by all functional cells in the body. It is used as a biomarker for renal function, and in CV risk assessment although there is no evidence that this marker improves outcomes when used in clinical care. The NACB guidelines on Biomarkers of Renal Function and Cardiovascular Disease Risk do not recommend testing. The NCEP advocates clinical studies to characterize the utility of these markers in the global assessment of CV disease risk.

## Thrombogenic/Hematologic Factors

Hematologic factors including coagulation factors and platelets play a role in acute coronary syndrome although the precise mechanism is not known. That platelets are involved in this process is supported by strong evidence that aspirin and other antiplatelet therapies reduce the risk of myocardial infarction.

Fibrinogen has also been associated with CHD risk. A high fibrinogen level is associated with increased risk for coronary events, independent of cholesterol levels, while a low fibrinogen indicates a reduced risk even with high cholesterol levels. Other hemostatic factors associated with increased coronary risk include, but are not limited to, activated factor VII (aFVII), tissue plasminogen activator (tPA), plasminogen activator inhibitor-1 (PAI-1), won Willebrand factor (wWF), Factor V Leiden (FVL), Factor II (F2), Protein C (PC) and antithrombin III.

In 2009, the NACB guidelines reported there was sufficient data that fibrinogen is an independent marker of CVD risk. In addition, measurement of fibrinogen was not recommended because they expressed analytical concerns regarding insufficient assay standardization and uncertainty in identifying treatment strategies. Additionally, the NCEP expert panel concluded "ATPIII does not recommend measurement of prothrombotic factors as part of routine assessment of CHD risk". They indicated that the strength of the association between thrombogenic/hemotologic factors and CHD risk has not been defined and recommended clinical trials that target specific prothrombotic factors.

D-dimer is associated with an increased risk of venous and arterial thrombotic events, irrespective of baseline vascular disease, even after adjusting for confounders such as age, smoking and diabetes. In CVD, an increased fibrin turnover represents not only a prothrombotic state, but also is a marker for the severity of atherosclerosis. Although D-dimer is a simple test that is widely available, it remains unclear whether D-dimer plays a causal role in the pathophysiology of CV adverse events, or whether D-dimer is simply a marker of the extent of disease.

## Interleukin-6 (IL-6), Tissue Necrosis Factor- a (TNF-a), Plasminogen Activator Inhibitor-1 (PAI-1), and IL-6 Promoter Polymorphism

Adipose tissue is a prominent source of PAI-1. Recent data indicates there is continuous production of large amounts of active PAI-1 in platelets that may contribute to clot stabilization. PAI-1 is the primary physiological inhibitor of plasminogen activation. Increased PAI-1 expression acts as a CV risk factor and plasma levels of PAI-1 strongly correlate with body mass index (BMI). Similar associations have been reported between PAI-1 activity and plasma insulin and triglyercide levels in patients with CAD and diabetes. However, there is no data that PAI-1 testing changes physician management to improve patient outcomes.

IL-6, an inflammatory cytokine, is involved in metabolic regulation of CRP. IL-6 plays an important role in the process of rupture or erosion of atherosclerotic plaques, and its serum levels are elevated during these events. At the current time, there is no consensus on IL-6 assay methods or reference values, and no data that demonstrates IL-6 testing changes physician management to improve patient outcomes.

Early in atherosclerotic plaque formation, leukocytes adhere to and are entrapped in the endothelial wall, a process mediated by inflammatory adhesion molecules such as P-selectin and ICAM-1 that are modulated by TNF-a. However, to date, these biomarkers have not provided additional predictive power above that of traditional lipid markers.

Because a polymorphism in the promoter region of IL-6 (174 bp upstream from the start site) appears to influence the transcription of the IL-6 gene and plasma levels of IL-6, this functional polymorphism was considered a candidate gene in the development of CV disease. However, multiple studies have produced inconsistent findings. In a large population-based study, no significant relationship between IL-6 promoter polymorphism and risk of CHD was identified. The authors concluded that IL-6-174 promoter polymorphism is not a suitable genetic marker for increased risk of CHD in person aged 55 years or older.

## Free Fatty Acids (FFA, Saturated and Unsaturated)

The role of plasma FFA in thrombogenesis in humans is poorly established and no strong direct evidence is available. Increasing plasma FFA concentration is known to induce endothelial activation, increase plasma MPO level and promote a prothrombotic state in non-diabetic healthy subjects. Studies are ongoing to demonstrate the role of FFA in the pathogenesis of atherosclerosis. However, at the current time, there is sparse data on its role in early atherosclerosis and no evidence how testing improves patient outcomes.

## Visfatin, Angiotensin-Converting Enzyme 2 (ACE2) and Serum Amyloid A

Visfatin is an active player promoting vascular inflammation and associated with atherosclerosis-related disease. It is involved in cytokine and chemokine secretion, macrophage survival, leukocyte recruitment by endothelial cells, vascular smooth muscle inflammation and plaque destabilization. Although visfatin has emerged as a promising pharmacological target in the context of CV complications, there is no evidence how testing improves patient outcomes.

The renin-angiotensin system (RAS) plays a major role in the pathophysiology of CVD. The enzyme angiotensin-converting enzyme (ACE) converts angiotensin I into the vasoconstrictor, angiotensin II, the main effector of the renin-angiotensin system. It has been suggested that circulating ACE2 may be a marker of CVD with low levels of ACE2 in healthy individuals and increased levels in those with CV risk factors or disease. However, larger clinical studies are needed to clarify the role of ACE2 as a biomarker of CVD, determine the prognostic significance of circulating ACE2 activity and assess whether the measurement of ACE2 will improve CVD risk prediction.

Serum amyloid A (SAA) is a sensitive marker of inflammation and its elevation has been implicated in obesity and in CVD. It is a highly conserved acute-phase protein, stimulated by proinflammatory cytokines such as IL-6, TNF,

interferon-gamma and transforming growth factor-beta (TGF). BAI is also a kind of apolipoprotein that is involved in cholesterol metabolism. However, there is sparse data on its role in early atherosclerosis and no evidence how testing improves patient outcomes.

## Microalbumin

Microalbuminuria is both a renal risk factor and a CV risk factor in patients with diabetes, and particularly a risk marker of CV mortality in the general population. Microalbuminuria also appears to be a sensitive marker for detecting new onset of hypertension and diabetes. However, for albuminuria to be a target for therapy, one needs to prove that lowering of albuminuria per se is cardioprotective. Albuminuria-lowering effect of antihypertensive agents, particularly those that interfere with RAS, and the use of statins and glucoseaminoglycans have been proved in randomized, controlled trial to be cardioprotective. However, few have been directed at albuminuria lowering per se to evaluate the effect on CV outcome. The question remains as to whether microalbuminuria is the consequence or the cause of organ damage, particularly whether high levels of albuminuria in young children reflect normal physiological variations in endothelial function associated with CV and renal risk in later age. While albumin excretion levels may represent a primary marker for success of intervention strategies aimed at repairing vascular function, there is no data how testing improves patient outcomes at the current time.

## Myeloperoxidase (MPO)

Elevated levels of myeloperoxidase, secreted during acute inflammation, are thought by some to be associated with coronary disease and predictive of acute coronary syndrome in patients with chest pain. Many studies have implicated MPO in the pathogenesis of atherosclerosis, showing that it is enriched within atheromatous plaques. Inflammatory cells recruited into the vascular wall release MPO-derived reactive oxygen species that can promote endothelial dysfunction by reducing the bioavailability of nitric oxide, generate atherogenic oxidized-LDL, and modify HDL, impairing its function in cholesterol efflux. However, at the current time there is insufficient data to demonstrate that plasma MPO can predict CHD independent of other CVD risk factors and there is no data that demonstrates how plasma MPO levels affect management of individuals at risk for or patients with CHD.

PPAR-? is a key regulator of fatty acid metabolism, promoting its storage in adipose tissue and reducing circulating levels of free fatty acids. Activation of PPAR-? has favorable effects on surrogate measures of adipocyte function, insulin sensitivity, lipoprotein metabolism, and vascular structure and function. However clinical trials of thiazolidinedione PPAR-? activators have not provided conclusive evidence that they reduce CV morbidity and mortality.

At the current time, there is no clinical data that demonstrates the clinical utility of testing for lipid peroxidation, isoprostanes, malondialdehyde, nitrotyrosine, S-glutathionylation, oxidized LDL, or oxidized phospholipids. Additionally, genetic testing for genes that regulate cellular and systemic oxidative stress, including but not limited to, nuclear factor-2 (Nrf-2), peroxisome proliferator-activated receptor gamma-co-activator 1alpha (PCG-1a), and the thioredoxin family or proteins have no clinical data that demonstrates utility.

## Homocysteine and Methylenetetrahydrofolate Reductase (MTHFR) Mutation Testing

Homocysteine is an amino acid found in the blood. Observational evidence generally supports the association of homocysteine levels with CV risk, particularly observational data that patients with hereditary homocystinuria, an inborn error of metabolism associated with high plasma levels of homocysteine, have markedly increased risk of CV disease. Folic acid and the B vitamins are involved in the metabolism of homocysteine. Several studies found the higher levels of B vitamins are associated with lower homocysteine levels, while other evidence shows that low levels of folic acid are linked to a higher risk of CHD and stroke. However, large randomized controlled trials do not support a protective effect of folic acid supplementation (rectifying homocysteine levels) in cardiovascular disease.

MTHFR is a key enzyme in folate metabolism. Two variants of the MTHFR polymorphisms result in reduced enzyme activity, impaired methylation and increased risk of CVD, stroke, and hypertension. MTHFR mutation testing has been advocated to evaluate the cause of elevated homocysteine levels.

However, in 2009, the US Preventive Services Task Force (USPSTF) concluded that the evidence was insufficient to assess the benefits and harms of using non-traditional risk factors to screen asymptomatic adults with no history of CHD to prevent CHD events. Homocysteine was one of the non-traditional factors considered in the recommendation. In 2010, later updated in March 2014, the AHA stated that a causal link between homocysteine levels and atherosclerosis has not been established, and noted that high homocysteine levels is not a major risk factor for CV disease. The 2012 American Association of Clinical Endocrinologists (AACE) guidelines for management of dyslipidemia and prevention of atherosclerosis stated that testing for homocysteine, uric acid, PAI-1 or other inflammatory markers is not recommended.

A recent systemic review and meta-analysis suggests that elevated uric acid levels may modestly increase the risk of stroke and mortality. However, future studies are needed to determine whether lowering uric acid levels has any beneficial effects on stroke risk. Data is inadequate to show that uric acid testing changes physician management to improve patient outcomes.

## Vitamin D

Low levels of vitamin D are an independent risk factor for CV death in populations without pre-existing CV disease. However, systematic reviews on interventional vitamin D supplementation and CV disease risk reported that vitamin D supplementation had no effect on cardiovascular disease risk, indicating a lack of a causal relationship.

An additional concern regarding vitamin D testing is the considerable variation between results obtained with the various methods (competitive immunoassays, direct detection by high performance liquid chromatography or liquid chromatography combined with tandem mass spectrometry), as well as between laboratories. Immunoassay technologies are less sensitive and specific for vitamin D than liquid chromatography with or without mass spectrometry.

## WBC

A large body of data from prospective studies has established an association of leukocyte count with increased risk for CVD events. Leukocytes are thought to play a role in the development and/or progression of atherosclerotic plaques and their rupture due to their proteolytic capacity and oxidative properties. WBC count is correlated with other coronary disease risk factors, including cigarette smoking, BMI, cholesterol level, HDL-C (inversely), triglycerides, diabetes and blood glucose level, physical activity (inversely) and blood pressure. However, the NACB does not recommend WBC testing because clinical utility in reclassifying risk level and identifying treatment strategies is not known.

## Long-chain Omega-3 Fatty Acids in Red Blood Cell (RBC) Membranes

It has been proposed that the fatty acid composition of RBCs are an index of long-term intake of eicosapentaenoic (EPA) plus docosahexaenoic (DPA) acids. The omega-3 fatty acids are considered a new modifiable and clinically relevant risk factor for death from CHD. Most studies to date have focused on the association between fish consumption and risk of CHD. In the Rotterdam Study, analysis of EPA plus DHA and fish intake was assessed in relation of incident heart failure (HF). With nearly 5300 study individuals, the authors concluded that their findings did not support a major role for fish intake in the prevention of HF. Not only is there no association between fish intake and EPA+DHA levels regarding prevention of HF, there is no scientific evidence regarding how measurements of RBC omega-3 fatty acids composition would affect management of individuals at risk for or patients with CHD. A recent article (Marai, 2014) notes that the available data do not support testing for omega-3 polyunsaturated fatty acids (EPA + DHA) among healthy subjects and patients with specific cardiac diseases.

## Gamma-glutamyltransferase (GGT)

GGT, a marker of excessive alcohol consumption or liver disturbance, is an enzyme catalyzing the first step in extracellular degradation of the anti-oxidant gluatathione and is thought to play a role in the atherosclerotic process. Coverage for GGT is limited to the indications and limitations specified in CMS NCD 190.32. Whether serum levels of GGT can aid in the detection of individuals at high risk for incident CV events is under investigation. Despite its potential role in stratifying patient risk, there is no evidence testing improves patient outcomes.

## Gene Mutations (any methodology) and Genomic Profiling

Proponents of molecular CV profile testing argue that improvement in CVD risk classification leading to management changes that improve outcomes warrants coverage of these tests. However, the Evaluation of Genomic Applications in Practice and Prevention Working Group (EWG) found insufficient evidence to recommend testing for 9p21 genetic variant or 57 other variants in 28 genes to assess risk for CVD in the general population, specifically heart disease and stroke.

The following genes were included in the EWG's assessment: ACE, AGT, AGTR1, APOB, APOC3, APOE, CBS, CETP, CYBA, CYP11B2, F2, F5, GNB3, GPX1, IL1B, LPL, ITGB3, MTHFR, MTR, MTRR, NOS3, PAI-1, PON1, SELE, SOD2, SOD3, TNF, and 9p21. The EWG found that the magnitude of net health benefit from the use of any of these tests alone or in combination is negligible.

CardiaRisk™ (Myriad, Salt Lake City) markets a genotyping test to identify a mutation in the AGT gene. This test supposedly identifies specific hypertensive patients at increased risk of CV disease and identifies patients likely to respond to antihypertensive drug therapy. However, at the present time there is no literature that points to clinical utility for this test.

## Leptin, Ghrelin, Adiponectin, and Adipokines including Retinol Binding Protein 4 (RBP4) and Resistin

Leptin, a satiety factor secreted by adipocytes that is instrumental in appetite regulation and metabolism, is elevated in heart disease. In a recent study, leptin levels and proinflammatory high-density lipoprotein (piHDL) when combined into a risk score (PREDICTS) confers 28-fold increased odds of the presence of any current, progressive, or acquired carotid plaque and significantly associated with higher rates of intima-media thickness. However, there is no data that demonstrates how measurement of leptin levels affects management of individuals at risk for or patients with CHD.

Ghrelin is a hormone produced in the stomach and pancreas that plays a role in hunger and weight gain. In a recent study, ghrelin when incorporated in the CV risk model improved the prediction of CVD events in hypertensive patients with reclassification of roughly 21%. However, there is no evidence how testing improves patient outcomes.

Adiponectin is an adipose-specific hormone that has anti-inflammatory properties, and is protective against obesity. Particularly in children, measurement of total adiponectin or high-molecular-weight adiponection (HMW adiponectin) as a biomarker for insulin sensitivity and/or as a risk factor for CVD is gaining support. However, the additive value of adiponectin levels remains unclear and how it changes patient outcomes is not known. It is not recommended clinically in children or adults.

RBP4 is gaining recognition as an adipokine that may play an important role in obesity and insulin resistance. The relationship between RBP4 and other traditional and non-traditional risk factors for CVD, such as inflammatory factors and/or oxidative stress, have not been confirmed in larger populations, and causality has not been established.

Resistin is an adipokine expressed highly in visceral compared with subcutaneous adipose tissue. In the Study of Inherited Risk of Coronary Atherosclerosis (Reilly, 2003), resistin levels were positively correlated with higher coronary calcium scores and correlated with higher levels of soluble TNF-a, receptor-2, Lp(a), and IL-6. The resistin gene (RETN) polymorphism (bp -420 and +299) leads to increased concentrations of the resistin peptide in circulation, which is associated with cardiomyopathy and CAD. One study suggests that in addition to primary risk factors (total cholesterol, LDL, triglycerides and low concentrations of HDL), resistin cytokine may be a risk factor for CVD. However, there is no clinical role for measuring resistin as no data demonstrates how measurement of resistin levels affects management of individuals at risk for or patients with CHD.

## Inflammatory Markers – VCAM-1, ICAM-1, P-selectin (PSEL) and E-selectin (ESEL)

Clinical studies have shown that elevated serum concentrations of cell adhesion molecules such as inter-cellular adhesion molecule-1 (ICAM-1), vascular adhesion molecule-1 (VCAM-1), E-selectin (ESEL) and P-selectin (PSEL) may contribute to CVD through their inflammatory effects on the vascular endothelium and be independent risk factors for atherosclerosis and cardiovascular disease (CVD). However, at the current time, testing for these inflammatory markers has not been confirmed in larger populations, causality has not been established and testing has not resulted in improved patient outcomes.

## Cardiovascular Risk Panels

Numerous CV risk panels are commercially available. These panels report results for multiple individual CV risk markers and have wide variability in the risk factors included in the panel including different combinations of lipids, non-cardiac biomarkers, measures of inflammation, metabolic and hematologic markers, and/or genetic markers. While the individual risk factors included in CV risk panels have, in most cases been associated with increased risk of CV disease, it is not clear how the results of individual risk factors impact management changes, so it is also not certain how the panels will impact management decisions. The lack of evidence for clinical utility of any individual non-traditional risk factor beyond simple lipid measures predict the lack of evidence for clinical utility for the use of CV risk panels, as there is no evidence that any panel improves patient outcomes. As a result, the use of cardiac risk panels for predicting risk of CV disease is considered not medically reasonable and necessary and therefore, not payable by Medicare.

Some examples of commercially available CV risk panels include, but are not limited to, the following:

- Health Diagnostics Cardiac Risk Panel
- Boston Heart Advanced Risk Markers Panel
- Genova Diagnostics CV Health Plus Genomics Panel

- Metametrix Cardiovascular Health Profile
- Cleveland HeartLab CVD Inflammatory Panel
- Applied Genetics Cardiac Panel
- Genetiks Genetic Diagnostic and Research Center Cardiovascular Risk Panel

Back to Top

# Coding Information



Bill Type Codes:

Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.

N/A
Revenue Codes:

Contractors may specify Revenue Codes to help providers identify those Revenue Codes typically used to report this service. In most instances Revenue Codes are purely advisory; unless specified in the policy services reported under other Revenue Codes are equally subject to this coverage determination. Complete absence of all Revenue Codes indicates that coverage is not influenced by Revenue Code and the policy should be assumed to apply equally to all Revenue Codes.

N/A
CPT/HCPCS Codes
**Group 1 Paragraph:** The following CPT code is covered:

**Group 1 Codes:**
82172 APOLIPOPROTEIN, EACH
82610 CYSTATIN C
83090 HOMOCYSTEINE
83695 LIPOPROTEIN (A)
83698 LIPOPROTEIN-ASSOCIATED PHOSPHOLIPASE A2 (LP-PLA2)
83700 LIPOPROTEIN, BLOOD; ELECTROPHORETIC SEPARATION AND QUANTITATION
        LIPOPROTEIN, BLOOD; HIGH RESOLUTION FRACTIONATION AND QUANTITATION OF LIPOPROTEINS
83701 INCLUDING LIPOPROTEIN SUBCLASSES WHEN PERFORMED (EG, ELECTROPHORESIS,
        ULTRACENTRIFUGATION)
83704

LIPOPROTEIN, BLOOD; QUANTITATION OF LIPOPROTEIN PARTICLE NUMBERS AND LIPOPROTEIN PARTICLE SUBCLASSES (EG, BY NUCLEAR MAGNETIC RESONANCE SPECTROSCOPY)
83719 LIPOPROTEIN, DIRECT MEASUREMENT; VLDL CHOLESTEROL
83721 LIPOPROTEIN, DIRECT MEASUREMENT; LDL CHOLESTEROL
83880 NATRIURETIC PEPTIDE
86141 C-REACTIVE PROTEIN; HIGH SENSITIVITY (HSCRP)

ICD-10 Codes that Support Medical Necessity
**Group 1 Paragraph:** The following ICD-10 codes are covered:

**Group 1 Codes:**

| ICD-10 Codes | Description |
| --- | --- |
| E71.30 | Disorder of fatty-acid metabolism, unspecified |
| E75.21 | Fabry (-Anderson) disease |
| E75.22 | Gaucher disease |
| E75.240 | Niemann-Pick disease type A |
| E75.241 | Niemann-Pick disease type B |
| E75.242 | Niemann-Pick disease type C |
| E75.243 | Niemann-Pick disease type D |
| E75.248 | Other Niemann-Pick disease |
| E75.249 | Niemann-Pick disease, unspecified |
| E75.3 | Sphingolipidosis, unspecified |
| E75.5 | Other lipid storage disorders |
| E75.6 | Lipid storage disorder, unspecified |
| E77.0 | Defects in post-translational modification of lysosomal enzymes |
| E77.8 | Other disorders of glycoprotein metabolism |
| E77.9 | Disorder of glycoprotein metabolism, unspecified |
| E78.0 | Pure hypercholesterolemia |
| E78.1 | Pure hyperglyceridemia |
| E78.2 | Mixed hyperlipidemia |
| E78.3 | Hyperchylomicronemia |
| E78.4 | Other hyperlipidemia |
| E78.5 | Hyperlipidemia, unspecified |
| E78.70 | Disorder of bile acid and cholesterol metabolism, unspecified |
| E78.79 | Other disorders of bile acid and cholesterol metabolism |
| E78.81 | Lipoid dermatoarthritis |
| E78.89 | Other lipoprotein metabolism disorders |
| E78.9 | Disorder of lipoprotein metabolism, unspecified |
| E88.1 | Lipodystrophy, not elsewhere classified |
| E88.2 | Lipomatosis, not elsewhere classified |
| E88.89 | Other specified metabolic disorders |
| I10 | Essential (primary) hypertension |
| I25.10 | Atherosclerotic heart disease of native coronary artery without angina pectoris |
| I42.0 | Dilated cardiomyopathy |
| I48.2 | Chronic atrial fibrillation |
| I48.91 | Unspecified atrial fibrillation |
| I51.9 | Heart disease, unspecified |
| I52 | Other heart disorders in diseases classified elsewhere |
| I70.0 | Atherosclerosis of aorta |
| I70.1 | Atherosclerosis of renal artery |
| I70.201 | Unspecified atherosclerosis of native arteries of extremities, right leg |
| I70.202 | Unspecified atherosclerosis of native arteries of extremities, left leg |
| I70.203 | Unspecified atherosclerosis of native arteries of extremities, bilateral legs |
| I70.208 | Unspecified atherosclerosis of native arteries of extremities, other extremity |
| I70.209 | Unspecified atherosclerosis of native arteries of extremities, unspecified extremity |

| ICD-10 Codes | Description |
|---|---|
| I70.211 | Atherosclerosis of native arteries of extremities with intermittent claudication, right leg |
| I70.212 | Atherosclerosis of native arteries of extremities with intermittent claudication, left leg |
| I70.213 | Atherosclerosis of native arteries of extremities with intermittent claudication, bilateral legs |
| I70.218 | Atherosclerosis of native arteries of extremities with intermittent claudication, other extremity |
| I70.219 | Atherosclerosis of native arteries of extremities with intermittent claudication, unspecified extremity |
| I70.221 | Atherosclerosis of native arteries of extremities with rest pain, right leg |
| I70.222 | Atherosclerosis of native arteries of extremities with rest pain, left leg |
| I70.223 | Atherosclerosis of native arteries of extremities with rest pain, bilateral legs |
| I70.228 | Atherosclerosis of native arteries of extremities with rest pain, other extremity |
| I70.229 | Atherosclerosis of native arteries of extremities with rest pain, unspecified extremity |
| I70.231 | Atherosclerosis of native arteries of right leg with ulceration of thigh |
| I70.232 | Atherosclerosis of native arteries of right leg with ulceration of calf |
| I70.233 | Atherosclerosis of native arteries of right leg with ulceration of ankle |
| I70.234 | Atherosclerosis of native arteries of right leg with ulceration of heel and midfoot |
| I70.235 | Atherosclerosis of native arteries of right leg with ulceration of other part of foot |
| I70.238 | Atherosclerosis of native arteries of right leg with ulceration of other part of lower right leg |
| I70.239 | Atherosclerosis of native arteries of right leg with ulceration of unspecified site |
| I70.241 | Atherosclerosis of native arteries of left leg with ulceration of thigh |
| I70.242 | Atherosclerosis of native arteries of left leg with ulceration of calf |
| I70.243 | Atherosclerosis of native arteries of left leg with ulceration of ankle |
| I70.244 | Atherosclerosis of native arteries of left leg with ulceration of heel and midfoot |
| I70.245 | Atherosclerosis of native arteries of left leg with ulceration of other part of foot |
| I70.248 | Atherosclerosis of native arteries of left leg with ulceration of other part of lower left leg |
| I70.249 | Atherosclerosis of native arteries of left leg with ulceration of unspecified site |
| I70.25 | Atherosclerosis of native arteries of other extremities with ulceration |
| I70.261 | Atherosclerosis of native arteries of extremities with gangrene, right leg |
| I70.262 | Atherosclerosis of native arteries of extremities with gangrene, left leg |
| I70.263 | Atherosclerosis of native arteries of extremities with gangrene, bilateral legs |
| I70.268 | Atherosclerosis of native arteries of extremities with gangrene, other extremity |
| I70.269 | Atherosclerosis of native arteries of extremities with gangrene, unspecified extremity |
| I70.291 | Other atherosclerosis of native arteries of extremities, right leg |
| I70.292 | Other atherosclerosis of native arteries of extremities, left leg |
| I70.293 | Other atherosclerosis of native arteries of extremities, bilateral legs |
| I70.298 | Other atherosclerosis of native arteries of extremities, other extremity |
| I70.299 | Other atherosclerosis of native arteries of extremities, unspecified extremity |
| I70.301 | Unspecified atherosclerosis of unspecified type of bypass graft(s) of the extremities, right leg |
| I70.302 | Unspecified atherosclerosis of unspecified type of bypass graft(s) of the extremities, left leg |
| I70.303 | Unspecified atherosclerosis of unspecified type of bypass graft(s) of the extremities, bilateral legs |
| I70.308 | Unspecified atherosclerosis of unspecified type of bypass graft(s) of the extremities, other extremity |
| I70.309 | Unspecified atherosclerosis of unspecified type of bypass graft(s) of the extremities, unspecified extremity |
| I70.311 | Atherosclerosis of unspecified type of bypass graft(s) of the extremities with intermittent claudication, right leg |
| I70.312 | Atherosclerosis of unspecified type of bypass graft(s) of the extremities with intermittent claudication, left leg |
| I70.313 | Atherosclerosis of unspecified type of bypass graft(s) of the extremities with intermittent claudication, bilateral legs |
| I70.318 | Atherosclerosis of unspecified type of bypass graft(s) of the extremities with intermittent claudication, other extremity |
| I70.319 | Atherosclerosis of unspecified type of bypass graft(s) of the extremities with intermittent claudication, unspecified extremity |
| I70.321 | Atherosclerosis of unspecified type of bypass graft(s) of the extremities with rest pain, right leg |
| I70.322 | Atherosclerosis of unspecified type of bypass graft(s) of the extremities with rest pain, left leg |
| I70.323 | Atherosclerosis of unspecified type of bypass graft(s) of the extremities with rest pain, bilateral legs |
| I70.328 | Atherosclerosis of unspecified type of bypass graft(s) of the extremities with rest pain, other extremity |

| ICD-10 Codes | Description |
|---|---|
| I70.329 | Atherosclerosis of unspecified type of bypass graft(s) of the extremities with rest pain, unspecified extremity |
| I70.331 | Atherosclerosis of unspecified type of bypass graft(s) of the right leg with ulceration of thigh |
| I70.332 | Atherosclerosis of unspecified type of bypass graft(s) of the right leg with ulceration of calf |
| I70.333 | Atherosclerosis of unspecified type of bypass graft(s) of the right leg with ulceration of ankle |
| I70.334 | Atherosclerosis of unspecified type of bypass graft(s) of the right leg with ulceration of heel and midfoot |
| I70.335 | Atherosclerosis of unspecified type of bypass graft(s) of the right leg with ulceration of other part of foot |
| I70.8 | Atherosclerosis of other arteries |
| I70.90 | Unspecified atherosclerosis |
| I70.91 | Generalized atherosclerosis |
| I70.92 | Chronic total occlusion of artery of the extremities |
| R00.2 | Palpitations |
| R07.1 | Chest pain on breathing |
| R07.2 | Precordial pain |
| R07.82 | Intercostal pain |
| R07.89 | Other chest pain |
| R07.9 | Chest pain, unspecified |
| Z13.220 | Encounter for screening for lipid disorders |
| Z13.6 | Encounter for screening for cardiovascular disorders |
| Z86.711 | Personal history of pulmonary embolism |
| Z86.718 | Personal history of other venous thrombosis and embolism |
| Z86.72 | Personal history of thrombophlebitis |
| Z86.73 | Personal history of transient ischemic attack (TIA), and cerebral infarction without residual deficits |
| Z86.74 | Personal history of sudden cardiac arrest |
| Z86.79 | Personal history of other diseases of the circulatory system |

ICD-10 Codes that DO NOT Support Medical Necessity N/A
ICD-10 Additional Information

Back to Top

# General Information



Associated Information

**Documentation Requirements**
The patient's medical record must contain documentation that fully supports the medical necessity for services included within this LCD. (See "Coverage Indications, Limitations, and/or Medical Necessity") This documentation includes, but is not limited to, relevant medical history, physical examination, and results of pertinent diagnostic tests or procedures.

Documentation supporting the medical necessity should be legible, maintained in the patient's medical record, and must be made available to the MAC upon request.

Sources of Information and Basis for Decision
**References:**

1. American Heart Association. AHA Recommendation: Homocysteine, Folic Acid and Cardiovascular Risk. Retrieved on Feb 26, 2015 from http://www.heart.org/HEARTORG/GettingHealthy/NutritionCenter/Homocysteine-Folic-Acid-and-Cardiovascular-Disease_UCM_305997_Article.jsp

2. Balagopal P, de Ferranti SD, Cook S. et al. AHA Scientific Statement: Nontraditional risk factors and biomarkers for cardiovascular disease: mechanistic, research and clinical considerations for youth. Circulation. 2011; 123: 2749-69. doi: 10.1161/CIR.0b013e31821c7c64.

3. Bays HE, Jones PH, Brown WV, et al. National lipid association annual summary of clinical lipidology. 2015. Journal of Clinical Lipidology. 2015;8:S1-36

4. Brunzell JD, Davidson M, Furberg CD, et al. Lipoprotein management in patients with cardiometabolic risk: Consensus conference report from American Diabetes Association and American College of Cardiology Foundation. J Am Coll Cardiol. 2008;51:1512-24

5. Casas JP, Shah T, Hingorani AD, et al. C-reactive protein and coronary heart disease: a critical review. J Intern Med. 2008;264:95–314.

6. Contois JH, McConnell JP, Sethi AA, et al. Apolipoprotein B and Cardiovascular Disease Risk: Position statement from the AACC lipoprotein and vascular diseases division working group on best practices. Clin Chem. 2009;55:407-19

7. Cromwell WC, Barringer TA. Low-density lipoprotein and apolipoprotein b: Clinical use in patients with coronary heart disease. Curr Cardiol Rep 2009;11:468-75.

8. Davidson MH, Ballantyne CM, Jacobson TA, et al. Clinical utility of inflammatory markers and advance lipoprotein testing: Advice from an expert panel of lipid specialists. Journal of Clinical Lipidology. 2011;5:338-67

9. de Zeeuw D, Parving H, Henning RH. Microalbuminuria as an early marker for cardiovascular disease. JASN 2006;17(8):2100-5. doi: 10.1681/ASN.2006050517.

10. Dijkstra SC, Brouwer IA, van Rooij FJ, et al. "Intake of very long chain n-3 fatty acids from fish and the incidence of heart failure: the Rotterdam Study." Euro J Heart Fail 2009:11(10);922-928. doi: 10.1093/eurjhf/hfp126.

11. Elamin MB, Abu Elnour NO, Elamin KB, et al. Vitamin D and cardiovascular outcomes: a systematic review and meta-analysis. J Clin Endocrinol Metab. 2011;96:1931-42. doi.org/10.1210/jc.2011-0398.

12. Elliott P, Chambers JC, Zhang W, et al. Genetic loci associated with C-reactive protein levels and risk of coronary heart disease. JAMA. 2009;302:37–48.

13. Evaluation of Genomic Applications in Practice and Prevention (EGAPP) Working Group. Recommendations from the EGAPP Working Group: Genomic profiling to assess cardiovascular risk to improve cardiovascular health. Genet Med. 2010;12(12):839-43.

14. Garber AJ, Abrahamson MJ, Barzilay JI, et al. AACE Comprehensive diabetes management algorithm. Endocrine practice: official journal of the American College of Endocrinology and the American Association of Endocrinologists. 2013;19:327-36

15. Greenland P, Alpert JS, Beller GA, et al. 2010 ACCF/AHA Guideline for Assessment of Cardiovascular Risk in Asymptomatic Adults: Executive Summary. J Am Coll Cardiol. 2010;56(25):2182-2199. doi:10.1016/j.jacc.2010.09.002

16. Greenland P, Alpert JS, Beller GA, et al. 2010 ACCF/AHA guideline for assessment of cardiovascular risk in asymptomatic Adults: A report of the American College of Cardiology Foundation/American Heart Association Task Force on Practice Guidelines. J Am Coll Cardiol 2010;56(25): e50-e103. doi:10.1016/j.jacc.2010.09.001

17. Handelsman Y, Bloomgarden ZT, Grunberg G, et al. Clinical practice guidelines for developing a diabetes mellitus comprehensive care plan – 2015. Endocrine practice: official journal of the American College of Endocrinology and the American Association of Clinical Endocrinologists. 2015;21:1-87

18. Ho E, Galougahi KK, Liu C, et al. Biological markers of oxidative stress: application to cardiovascular research and practice. Redox Biology 2013;1:483-91. doi:10.1016/j.redox.2013.07.006

19. Huang JV, Greyson CR, Schwartz GG. PPAR-? as a therapeutic target in cardiovascular disease: evidence and uncertainty. Thematic review series: New lipid and lipoprotein targets for the treatment of cardiometabolic diseases. J Lipid Res. 2012;53:1738-54. doi: 10.1194/jlr.R024505

20. Ioannidis J, Tzzoulaki I. Minimal and null predictive effects for the most popular blood biomarkers of cardiovascular disease. Circulation Research. 2012;110:658-662. doi: 10.1161/RES.0b013e31824da8ad

21. Javed Q. Clinical implications of tumor necrosis factor-alpha, interleukin-6 and resistin in coronary artery disease. World J CV Dis. 2014;4:416-21. http://dx.doi.org/10.4236/wjcd.2014.49052.

22. Jellinger PS, Smith DA, Mehta AE, et al. American Association of Clinical Endocrinologists' guidelines for management of dyslipidemia and prevention of atherosclerosis. Endocrinology Practice. 2012;18(2):269-93.

23. Kleinegris MC, ten Cate H, ten Cate-Hoek AJ. D-dimer as a marker for cardiovascular and arterial thrombotic events in patients with peripheral arterial disease: a systematic review. Thromb Haemost 2013;110:1-11. doi:10.1160/TH13-01-0032.

24. Lee DS, Evans JC, Robins SJ, et al. Gamma glutamyl transferase and metabolic syndrome, cardiovascular disease, and mortality risk: the Framingham Heart Study. Arteriosclerosis, Thrombosis, and Vascular Biology. 2007;27:127-33. doi: 10.1161/01.ATV.0000251993.20372.40.

25. Marai I, Massalha S. Effect of omega-3 polyunsaturated fatty acids and vitamin D on cardiovascular diseases. IMAJ 2014:16;117-21.

26. McMahon M, Skaggs BJ, Grossman JM, et al. A panel of biomarkers is associated with increased risk of the presence and progression of atherosclerosis in women with systemic lupus erythematosus. Arthritis Pheumatol 2014;66(1):130-9. doi: 10.1002/art.38204

27. McPherson R. Remnant Cholesterol. J Am Coll Cardiol. 2013;61(4):437-9. doi:10.1016/j.jacc.2012.11.009.

28. Medicare Claims Processing Manual, Pub 100-04, Cpt 18, §100: Preventive and Screening Services, Cardiovascular Disease Screening.

29. Medicare National Coverage Determinations (NCD) Manual, Pub 100-03, Cpt 1, §190.23: Lipid Testing.

30. Myers GL, editor(s). Emerging biomarkers for primary prevention of cardiovascular disease and stroke. Washington (DC): National Academy of Clinical Biochemistry. 2009. doi: 10.1373/clinchem.2008.115899. Epub 2008 Dec 23

31. National Academy of Clinical Biochemistry: Laboratory Medicine Practice Guidelines, Emerging biomarkers for primary prevention of cardiovascular disease and stroke. April, 2009.

32. National Cholesterol Education Program (NCEP). Third Report of the Expert Panel on Detection, Evaluation, and Treatment of High Blood Cholesterol in Adults (ATP III Final Report). NIH, NHLBI. NIH Pub. No. 02-5215. Sept 2002.

33. National Cholesterol Education Program (NCEP). Third report of the expert panel on detection, evaluation, and treatment of high blood cholesterol in adults (ATP III Final Report). NIH, NHLBI. Sept 2002. NIH Pub. No. 02-5215.

34. Patel SK, Velkoska E, Burrell LM. Emerging markers in cardiovascular disease: where does angiotensin-converting enzyme 2 fit in? Clin Exp Pharmacol Physiol. 2013;40(8):551-9. doi: 10.1111/1440-1681.12069.

35. Pearson TA, Mensah GA, Alexander RW, et al. Markers of inflammation and cardiovascular disease; application to clinical and public health practice; a statement for healthcare professionals from the Centers for Disease Control and Prevention and the American Heart Association. Circulation 2003:107(3):499-511.

36. Pepys MB. C-reactive protein is neither a marker nor a mediator of atherosclerosis. Nat Clin Pract Nephrol. 2008;4:234–5.

37. Ridker PM, Buring JE, Cook NR, Rifai N. C-reactive protein, the metabolic syndrome, and risk of incident cardiovascular events: an 8-year follow-up of 14,719 initially healthy American women. Circulation 2003;107:391-7.

38. Ridker PM, Rifai N, Rose L, et al. Comparison of C-reactive protein and low-density lipoprotein cholesterol levels in the prediction of first cardiovascular events. N Engl J Med 2002;347:1557–65.

39. Romacho T, Sanchez-Ferrer CF, Peiro C. Visfatin/Nampt: An adipokine with cardiovascular impact. Mediators of Inflammation 2013: Article ID 946427. http://dx.doi.org/10.1155/2013/946427.

40. Rosenson RS, Stein JH, Durrington P. Lipoprotein(a) and cardiovascular disease. UpToDate®, Freeman MW (Ed). Waltham, MA 2014.

41. Shah T, Casas JP, Cooper JA, et al. Critical appraisal of CRP measurement for the prediction of coronary heart disease events: new data and systematic review of 31 prospective cohorts. Int J Epidemiol. 2009;38:217–31.

42. Sie MPS, Sayed-Tabatabaei FAS, Oei HS, et al. Interleukin 6-174 G/C promoter polymorphism and risk of coronary heart disease: results from the Rotterdam Study and a meta-analysis. Arterioscler Thromb Vasc Biol. 2006;26:212-7.

43. Targonska-Stepniak B, Majdan M. Serum Amyloid A as a marker of persistent inflammation and an indicator of cardiovascular and renal involvement in patients with rheumatoid arthritis. Mediators of Inflammation 2014; Article ID 793628. http://dx.doi.org/10.1155/2014/793628.

44. Toth PP, Grabner M, Punekar RS, et al. Cardiovascular risk in patients achieving low-density lipoprotein cholesterol and particle targets. Atherosclerosis 2014;235: 585-91.

45. U.S. Preventive Services Task Force (USPSTF). Using Nontraditional Risk Factors in Coronary Heart Disease Risk Assessment: U.S. Preventive Services Task Force Recommendation Statement. October 6, 2009 vol. 151 no. 7 474-482. Retrieved on March 10, 2011 from http://www.annals.org/content/151/7/474.full.pdf+html

46. Using nontraditional risk factors in coronary heart disease risk assessment: U.S. Preventive Services Task Force Recommendation Statement. Ann Intern Med. 2009;151(7):474-82. doi:10.7326/0003-4819-151-7-200910060-00008.

47. Varbo A, Benn M, Tybjærg-Hansen A, et al. Remnant cholesterol as a causal risk factor for ischemic heart disease. J Am Coll Cardiol. 2013;61:427-36

48. Vaughan DE. PAI-1 and atherothrombosis. J Thromb Haemostasis 2005;3(8):1879-83.

49. Wang L, Manson JE, Song Y, Sesso HD. Systematic review: Vitamin D and calcium supplementation in prevention of cardiovascular events. Ann Intern Med. 2010;152:315-23.

50. Yano Y, Nakazato M, Toshinai K, et al. Circulating des-acyl ghrelin improves cardiovascular risk prediction in older hypertensive patients. Am J Hypertens. 2014;27(5):727-33. doi: 10.1093/ajh/hpt232.

# Revision History Information

N/A Back to Top

# Associated Documents

Attachments N/A

Related Local Coverage Documents Article(s) A54579 - Response to Comments for MolDX: Biomarkers in Cardiovascular Risk Assessment

Related National Coverage Documents N/A

Public Version(s) Updated on 08/13/2015 with effective dates 10/05/2015 - N/A Back to Top

# Keywords

N/A Read the **LCD Disclaimer** Back to Top